358                                                349 Mass. 358

General Electric Co. *v.* Director of the Division of Employment Security.

---

GENERAL ELECTRIC COMPANY *vs.* DIRECTOR OF THE DIVISION OF EMPLOYMENT SECURITY & others
(No. 2 of 1965).

Essex.    May 6, 1965. — June 14, 1965.

Present: SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Employment Security,* Stoppage of work through labor dispute.    *Labor. Words,* "Stoppage of work."

Where it appeared in an employment security case that upon a strike of welders at the employer's plant the claimants were laid off because their work and the welders' work were closely interdependent, and that the employer, in order to prevent the strike from putting a large number of other employees out of work, "farmed out" the welders' and the claimants' work, constituting an important segment of the production process at the plant, and thereby avoided any substantial curtailment of

349 Mass. 358                                              359

General Electric Co. *v.* Director of the Division of Employment Security.

end product deliveries, there was, within G. L. c. 151A, § 25 (b), "a stoppage of work . . . because of a labor dispute at" the plant to which, rather than the "farming out" of work, the claimants' unemployment was due.

PETITION filed in the District Court of Southern Essex on November 7, 1962, for review of a decision of the board of review in the Division of Employment Security.

The petitioner appealed from a decision by *Landergan, J.,* affirming the board's decision.

*Laurence S. Fordham* for the petitioner.

*Joseph S. Ayoub,* Assistant Attorney General (*Israel L. Cohen* with him), for the Director of the Division of Employment Security.

*Warren H. Pyle* for the claimant David W. Black.

CUTTER, J. These claimants for unemployment compensation are employees of the company. On November 20, 1961, twenty-two welders employed by the company in the same building with the claimants, who are not welders, went on strike. As a result, there was no work for nine sheet metal workers, who are among the claimants. "[A]pproximately twenty additional employees [at least some of whom are also claimants] . . . were laid off at various times as the work dried up." The work of the welders and the claimants was in various respects closely interdependent. The welders and the claimants belong to the bargaining unit of production and maintenance employees represented by the same union local.

Three hundred and fifty additional employees were notified not to report to work on Monday, December 4, 1961. Over the weekend of December 2–3, 1961, however, the company used laboratory and management personnel to do some welding work, and on December 4, 1961, it "farmed out" certain welding work needed in the assembly of company products. This was done "to get parts welded and to make them available to the people in the shop and to meet customers' schedules." As a consequence, some employees who had been laid off, or notified not to report for work, were recalled. The welders remained on strike until January 8, 1962.

The director, on January 3, 1962, approved the claims filed by the claimants because of the company's "decision to have work which ordinarily would be performed by the claimants done by an outside organization." The company requested a hearing before the board of review "on the ground that the employees involved . . . [were] not entitled to benefits as they were out of work due to a labor dispute."

The board of review found essentially the facts stated above. It pointed out that "[a]s a result of the strike . . . work for employees who worked hand-in-hand with the welders or who worked on parts either before or after they would have been welded, dwindled" and that "to continue production and . . . save the jobs of about three hundred and fifty people, the [c]ompany decided to 'farm out' . . . the welding operation." The board also found that "twenty-seven claimants were not recalled during the . . . dispute," that "there certainly was a labor dispute," that "there was no work stoppage of any consequence and that production continued at the same rate at which it existed prior to the strike." The board, ignoring the undisputed evidence that the disruption of usual production was a direct consequence of the welders' strike, concluded that the "claimants' unemployment was directly brought about by the . . . [company's] decision to farm the work out," and "that whatever took place was not such a stoppage of work . . . [as] the statute[1] requires." The board affirmed the director's determinations.

---

[1] General Laws c. 151A, § 25 (as amended through St. 1959, c. 554), reads in part, "No . . . benefits shall be paid to an individual . . . for . . . (b) Any week with respect to which the director finds that *his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory . . . or other premises at which he was last employed;* provided, however, that . . . [first proviso not relevant] and provided, further, that this subsection shall *not apply if it is shown to the satisfaction of the director that* — (1) He [the claimant] is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and that (2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute . . ." (emphasis supplied).

349 Mass. 358                                                    361

General Electric Co. *v.* Director of the Division of Employment Security.

The company then filed a petition for review in the District Court, which on August 6, 1964, affirmed the board's decision. The company appealed. The district judge filed a report, which includes a transcript of the evidence before the board.

The question for decision is whether, within G. L. c. 151A, § 25 (b), see fn. 1, there was "a stoppage of work which exists because of a labor dispute at the factory . . . or other premises" where the claimants were employed in November, 1961. There appears to be no dispute concerning the basic facts.

Two Massachusetts cases[2] have dealt with § 25 (b) in respects here relevant. In *Adomaitis* v. *Director of Div. of Employment Security,* 334 Mass. 520, this court dealt with "a general reduction of work in the plant, and . . . [did] not reach the question . . . whether individual or group refusals to work *which do not diminish the work done in the plant* can . . . be work stoppages" (emphasis supplied). It was held (pp. 523–524), "[T]he words 'stoppage of work' have a wider meaning than 'strike' or 'lockout' " and that the "board was right in holding in effect that where a labor dispute blocks a substantial amount of work which would otherwise be done it has stopped that much of the work and there is therefore a 'stoppage of work which exists because of a labor dispute.' " The court declined (p. 525) to limit the exclusions from unemployment benefits "to cases where all work had stopped."

In *Worcester Telegram Publishing Co. Inc.* v. *Director of Div. of Employment Security,* 347 Mass. 505, this court held that, upon the termination of a stoppage of work because of a labor dispute, strikers permanently displaced could then receive unemployment benefits for periods after fully normal operations in the employers' plant had been resumed (in the absence of circumstances like, or analogous

---

[2] *Moen* v. *Director of Div. of Employment Security,* 324 Mass. 246, *Martineau* v. *Director of Div. of Employment Security,* 329 Mass. 44, and *Wheeler* v. *Director of Div. of Employment Security,* 347 Mass. 730, in general deal with aspects of § 25 not here pertinent.

to, those which appeared in *Howard Bros. Mfg. Co.* v. *Director of Div. of Employment Security,* 333 Mass. 244; see note, 78 Harv. L. Rev. 1273).

In the case before us normal operations of the company's plant were materially obstructed by the welders' labor dispute from shortly after November 20, 1961, until January 8, 1962. Plant production would have been seriously curtailed except for the company's efforts to prevent the welders' strike from putting a great number of other employees out of work. The labor dispute directly caused those company efforts. Unfortunately, the company seems to have been unable to avoid laying off some employees who worked either closely with the welders or in processes very directly dependent upon the welders' work. The welders' work and the claimants' work was not carried on in the company's plant during most, if not all, of the period of dispute. There was a work stoppage in the sense that an important segment of the production process was forced out of the company's plant by the labor dispute.

If the company's management had been less efficient and had not quickly transferred the welders' work elsewhere, substantially more employees would have been laid off, and the delivery of end products from the plant would probably have soon been substantially reduced. Plainly, such a reduction in ultimate deliveries would have been regarded as a substantial stoppage of work.[3] See *Hughes,* 9300 Mass. Bd. Rev. p. 5. See also *Magner* v. *Kinney,* 141 Neb. 122; 129–131 (30% decrease in total business); *Mortensen* v. *Board of Review,* 21 N. J. 242, 244–245 ("diminution of the volume of work . . . otherwise . . . available"). Cf. *Cumberland & Allegheny Gas Co.* v. *Hatcher,* 147 W. Va. 630, 643. Although in the present case, there is no evidence that end product deliveries were materially curtailed by the labor dispute, the question remains whether such a

---

[3] See Shadur, Unemployment Benefits and the "Labor Dispute" Disqualification, 17 Univ. of Chi. L. Rev. 294, 307–312; Fierst and Spector, Unemployment Compensation in Labor Disputes, 49 Yale L. J. 461, 483–484. Cf. Williams, The Labor Dispute Disqualification, 8 Vand. L. Rev. 338, 340–341.

General Electric Co. *v.* Director of the Division of Employment Security.

curtailment is essential to a "stoppage of work" under § 25 (b). The work stoppage relied on by the company is that caused by the welders' failure to produce component parts of end products which put fifty employees, including the welders, out of work by December 1, 1961, and threatened to put 350 more persons out of work by December 4. We are thus faced with the novel question — whether such a stoppage of work in the company's plant itself, and the consequent transfer of work from the plant, created a disqualification of the claimants under § 25 (b), in the absence of a substantial and continuing disruption of end product deliveries.

The cases elsewhere indicate that the term "stoppage of work," in the disqualification clause of statutes much like § 25 (b), "refers to the effect upon the employer's operations produced by the labor dispute or, in other words, to resulting unemployment. . . . [I]t declares disqualification of a class . . . whose unemployment is the result of the curtailment or stoppage of the employer's operations. It does not refer to the cessation of work by the individual employee or employees." See *Magner* v. *Kinney,* 141 Neb. 122, 129–131.[4] See also *Mountain States Tel. & Tel. Co.* v. *Sakrison,* 71 Ariz. 219, 225 (very substantial curtailment); *Inter-Island Resorts, Ltd.* v. *Akahane,* 46 Hawaii, 140, 146–151; *Abbott Publishing Co.* v. *Annunzio,* 414 Ill. 559, 568–571; *Lawrence Baking Co.* v. *Unemployment Compensation Commn.* 308 Mich. 198, 209; *Cumberland & Allegheny Gas Co.* v. *Hatcher,* 147 W. Va. 630, 643. We recognize that some of the cases (e.g. the *Cumberland & Allegheny Gas Co.* case) have tended to require a showing of a very sub-

---

[4] The Nebraska court went on to say: "A labor dispute may produce a stoppage or curtailment of work in an employing establishment in three ways: (1) The cessation of work by all or part of the employees; (2) the cessation of work by a part of the employees may disable the employer from utilizing the services of other employees; (3) it may diminish patronage by customers or the public of the employing establishment and thereby produce a compensating unemployment of workers. In either event the resulting unemployment is due to a stoppage of work because of the labor dispute. Obviously, if those leaving work are immediately replaced, or if the dispute does not otherwise interfere with production or operation and these are not diminished, there is no stoppage of work and hence no disqualification."

stantial interruption of an employer's plant operations by
a labor dispute as the basis of a finding of a "stoppage of
work."

The *Adomaitis* case, 334 Mass. 520, 523–524, pointed out
that "where a labor dispute blocks a substantial amount of
work which would otherwise be done it has stopped that
much of the work." The case treated such an obstruction
as a "stoppage of work." Here, certainly, the welders'
dispute blocked the work of the nearly thirty claimants, in
addition to the welders' own work, and caused its removal
from the plant. This on its face was not an insubstantial
obstruction, and was in character so closely connected with
a labor dispute as to be within what appears to be the
policy of the disqualification of § 25 (b). That policy
denies unemployment benefits to those participating in a
labor dispute while a stoppage of work continues[5] and also
to certain classes of persons closely connected with, or in-
terested in (see the *Martineau* and *Wheeler* cases, *supra,*
fn. 2), such a dispute. Whatever the underlying reasons
for the policy may be (see the articles cited in fn. 3), the
policy goes at least to the extent just indicated.

The pressure exerted by the strike upon the production
process has prevented the company from having a substan-
tial amount of work performed in its own plant. We think
that the statutory language and its apparent policy require
us to treat this prevention of work as a "stoppage of work"
within the meaning of § 25 (b). The subsidiary findings
and the undisputed evidence before the board do not permit
the board's conclusion that the farming out of work caused
the claimants' unemployment. The record establishes that
both the claimants' unemployment and the stoppage of
work in the plant were caused by the labor dispute. The

---

[5] The stoppage, of course, continued until the plant resumed normal pro-
duction. See the *Worcester Telegram Publishing Co.* case, 347 Mass. 505,
508; *Sakrison* v. *Pierce,* 66 Ariz. 162, 170; *American Steel Foundries* v. *Gor-
don,* 404 Ill. 174, 182–183; *Abbott Publishing Co.* v. *Annunzio,* 414 Ill. 559,
570–571; *Chrysler Corp.* v. *Review Bd.* 120 Ind. App. 425, 432–433; *Buzza* v.
*Unemployment Compensation Commn.* 330 Mich. 223, 236–238; *Legacy* v.
*Clarostat Mfg. Co.* 99 N. H. 483, 485–487; *In re Stevenson,* 237 N. C. 528,
534; *Leach* v. *Republic Steel Corp.* 176 Ohio St. 221, 224–225.

findings and the evidence also do not permit the conclusion that there was no substantial stoppage of work.[6]

The decision of the District Court affirming the decision of the board of review is reversed. The case is to be remanded to the board for further proceedings consistent with this opinion.

*So ordered.*

---

[6] The burden, of course, is upon the claimants to show that they come within the exceptions to the general qualification defined by § 25 (b) (1) and (2). See the *Martineau* case, 329 Mass. 44, 51. No findings indicate whether these exceptions have relevance here, or whether significance is to be attached to the circumstances that the welders were all members of, or eligible for membership in, the same local organization of the same union. The board made no findings on these issues, presumably because it erroneously dealt with the case on the theory that there was no stoppage of work.