WESTINGHOUSE BROADCASTING CO., INC. *vs.* DIRECTOR OF
THE DIVISION OF EMPLOYMENT SECURITY & others.[1]

Suffolk. February 8, 1979. — May 8, 1979.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Employment Security,* Stoppage of work through labor dispute. *Words,*
"Stoppage of work."

The phrase "stoppage of work" in G. L. c. 151A, § 25 (*b*), refers to the
effect upon the employer's operations produced by a labor dispute
and not to the cessation of work by individual employees. [54-55]
In a proceeding for unemployment compensation benefits by em-
ployees who were locked out of their jobs by their employer, a
broadcasting company, evidence that personnel were trained, hired
or shifted to fill the jobs of the locked out employees, that the
stations continued broadcasting without interruption, and that
there was no loss of revenue or reduction in the number of commer-
cials broadcast supported a finding that there was no "stoppage of
work" within the meaning of G. L. c. 151A, § 25 (*b*). [55-56]
This court declined to decide whether its construction of the phrase
"stoppage of work" as used in G. L. c. 151A, § 25 (*b*), encroached on
the field preempted by Federal labor policy where the question was
more squarely presented in an ongoing Federal case between the
same parties. [56-57]
Upon appeal from a decision in a proceeding for unemployment com-
pensation benefits, it was not necessary to decide whether an em-
ployer's "offensive lockout" of employees, which results in a stop-
page of work, can be the basis for a disqualification for
unemployment benefits. [57-58]

CIVIL ACTION commenced in the Municipal Court of the
Brighton District on August 2, 1976.

The case was heard by *Artesani,* J.

*George C. Caner, Jr.* (*H. Reed Witherby* with him) for the
plaintiff.

*Joseph G. Sandulli* for Bruce W. Balcom & others.

---

[1] Bruce W. Balcom and others.

*Frank J. Scharaffa*, Assistant Attorney General (*Craig M. Bell* with him) for the Director of the Division of Employment Security.

QUIRICO, J. Sixty-nine employees of Westinghouse Broadcasting Company's Boston radio and television stations, WBZ, WBZ-FM, and WBZ-TV, applied for and received unemployment compensation benefits for one or more weeks between March 6 and July 11, 1976, during which time they were locked out of their jobs by their employer. Westinghouse appealed to the board of review of the Division of Employment Security (board) claiming that these employees (the claimants) were ineligible for benefits under G. L. c. 151A, § 25(*b*), which disqualifies a claimant whose "unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he was last employed . . . ." G. L. c. 151A, § 25(*b*), as amended by St. 1964, c. 355.

A majority of the board found there was no "stoppage of work" during the weeks in question, and hence no disqualification for benefits; a judge of the Municipal Court of the Brighton District affirmed. Both Westinghouse and the individual claimants filed claims of appeal to this court; we uphold the decision of the board.

The claimants in this case are broadcast technicians and news photographers who work at WBZ radio or television stations and are represented for collective bargaining purposes by the International Brotherhood of Electrical Workers, IBEW, Local No. 1228. On October 31 and November 30, 1975, the contracts between Westinghouse and Local No. 1228 covering these employees expired, and negotiations toward a new contract commenced. At approximately the same time, Westinghouse began training some fifteen or twenty other employees to perform the duties normally performed by members of Local No. 1228.

After a number of meetings between union and management representatives, contract negotiations reached

378 Mass. 51                                            53

Westinghouse Broadcasting Co., Inc. v. Director of the Div. of Employment Security.

an impasse. On March 6, 1976, Westinghouse notified all its bargaining unit employees by letter of its intention to continue operating without their services after midnight of that date. After this lockout, Westinghouse continued broadcasting operations by relying on the previously trained employees, on personnel brought in from other Westinghouse stations around the country, and on approximately thirty newly hired temporary employees to perform the work formerly done by the locked out employees. The board found that Westinghouse continued broadcasting after the lockout "to the same extent as prior to that date, except for very short periods of time when there were power failures," and that it continued to meet all the requirements placed on it by the Federal Communications Commission. Although recognizing that "the normal duties of management personnel and other employees" were "done on a reduced basis" because of the need to fill in for the locked out employees, the board concluded that there was no "substantial stoppage of work."

1. Westinghouse advances two main lines of argument in support of its position that the board erred: first, that the board applied the wrong legal standard for determining when there is a "stoppage of work," and second, that even under the board's standard, the evidence required the finding of a stoppage as a matter of law.

(a) We address the question of the proper legal standard first. Every State unemployment compensation statute contains some form of disqualification for workers who are out of work due to a labor dispute, but the precise terms of that disqualification vary. The original unemployment compensation statute in Massachusetts disqualified claimants whose "unemployment is directly due to a strike, lockout or other trade dispute still in active progress" (St. 1935, c. 479, § 5). However, in 1937 that section was amended by St. 1937, c. 421, § 1, to its present wording disqualifying a claimant whose unemployment is due to "a *stoppage of work* which exists because of a

labor dispute" (emphasis supplied). This "stoppage of work" language was taken from the suggested Model Federal Draft Bill of 1936, which in turn was modeled on the British National Unemployment Insurance Act, 1935, 25 & 26 Geo. 5, c. 8. See Lewis, The "Stoppage of Work" Concept in Labor Dispute Disqualification Jurisprudence, 45 J. Urb. L. 319, 322 (1967). It is the language adopted by the majority of States.

The meaning of this phrase "stoppage of work" has been the subject of litigation in almost every jurisdiction operating under it. The initial question is whether "stoppage" refers to the *operations* of an employer, or the work of the claimant *employees.* The vast majority of States, including Massachusetts, have long settled that the phrase "stoppage of work" "refers to the effect upon the employer's operations produced by the labor dispute. . . . It does not refer to the cessation of work by the individual employee or employees . . . [I]f those leaving work are immediately replaced, or if the dispute does not otherwise interfere with production or operation and these are not diminished, there is no stoppage of work and hence no disqualification." *General Elec. Co.* v. *Director of the Div. of Employment Security,* 349 Mass. 358, 363 & n.4 (1965), quoting from *Magner* v. *Kinney,* 141 Neb. 122, 129-131 (1942).[2] Only one State, in an opinion much criticised by commentators and other courts, has concluded to the contrary. *Board of Review* v. *Mid-Continent Petroleum Corp.,* 193 Okla. 36, 38 (1943).

---

[2] Accord, *Sakrison* v. *Pierce,* 66 Ariz. 162, 168 (1947); *Monsanto Chem. Co.* v. *Commissioner of Labor,* 229 Ark. 362, 364 (1958); *Inter-Island Resorts, Ltd.* v. *Akahane,* 46 Haw. 140, 148 (1962); *Totorica* v. *Western Equip. Co.,* 88 Idaho 534, 541 (1965); *Robert S. Abbott Publishing Co.* v. *Annunzio,* 414 Ill. 559, 569 (1953); *Bilodeau* v. *Maine Employment Security Comm'n,* 153 Me. 254, 260 (1957); *Lawrence Baking Co.* v. *Unemployment Compensation Comm'n,* 308 Mich. 198, 209, cert. denied, 323 U.S. 738 (1944); *Legacy* v. *Clarostat Mfg. Co.,* 99 N.H. 483, 486 (1955); *Albuquerque-Phoenix Express, Inc.* v. *Employ-Security Comm'n,* 88 N.M. 596, 601 (1975); *Fontaine* v. *Board of Review of Dep't of Employment Security,* 100 R.I. 37, 44 (1965); *Cumberland & Allegheny Gas Co.* v. *Hatcher,* 147 W. Va. 630, 638 (1963).

Westinghouse argues, however, that this judicial construction of the phrase "stoppage of work" is inconsistent with the definition adopted by the decisions of the British Umpires (analogous to our board of review) who were charged with construing the "stoppage of work" language in the British statute on which our statute is based. Even assuming, arguendo, that this were true, we do not feel bound to upset our settled construction, and to ignore or reject that of a large number of other American jurisdictions, because of a possibly different reading of the same language in certain decisions of the British Umpires forty and fifty years ago. We believe that the proper inquiry for the board should be, as it was in this case, whether the employer's operations were substantially curtailed as the result of a labor dispute.

(b) Westinghouse argues that even under this standard, the board was required in this case to find that there was a "stoppage of work" as a matter of law. To prevail on this ground, the employer must carry the heavy burden of demonstrating that there is no substantial evidence on the record adequate to support the decision of the board. G. L. c. 30A, § 14(7). *Keough* v. *Director of the Div. of Employment Security*, 370 Mass. 1, 3 (1976). Westinghouse points to evidence on the record showing that replacement — or "scab" — photographers were blocked in their efforts to film certain newsworthy events, and evidence that much work normally to be performed by the employees who were assigned to fill in for the locked out claimants went unperformed, and it argues that this was proof that the situation at WBZ, WBZ-FM, and WBZ-TV amounted to a "stoppage of work." The director, on the other hand, relies on the evidence that personnel were trained, hired or shifted to fill the jobs of locked out employees, that the stations continued broadcasting without interruption, and that there was no evidence of loss of revenue or reduction in the number of commercials broadcast as demonstrating that there was no substantial "stoppage of work." The question of how much disruption

of normal operations is necessary to constitute a "stoppage of work" is of course a matter of degree. Although most jurisdictions seem to require a "substantial curtailment" of normal work, see *Mountain States Tel. & Tel. Co.* v. *Sakrison*, 71 Ariz. 219, 225 (1950), *Monsanto Chem. Co.* v. *Commissioner of Labor*, 229 Ark. 362, 365 (1958), *Meadow Gold Dairies-Haw., Ltd.* v. *Wiig*, 50 Haw. 225 (1968), and *Cumberland & Allegheny Gas Co.* v. *Hatcher*, 147 W. Va. 630, 638 (1963), there are others which have held that less disruption amounts to a "stoppage of work," *Travis* v. *Grabiec*, 52 Ill. 2d 175 (1972). We have not attempted to declare a precise definition of the words "stoppage of work" in our prior cases, and in view of the diversity of factual situations which might arise in future cases, we decline to do so now. Neither *Adomaitis* v. *Director of the Div. of Employment Security*, 334 Mass. 520, 523 (1956), in which we held that a thirty-five per cent drop in production resulting from a "general reduction of work in the plant" was enough, nor *General Elec. Co.* v. *Director of the Div. of Employment Security*, 349 Mass. 358 (1965), in which we held that the cessation and subsequent contracting out of the company's welding operations constituted a "stoppage of work" is inconsistent with the conclusion of the board that there was no "stoppage of work" here, where Westinghouse experienced neither a drop in "production" (broadcasting schedule) nor the farming out of bargaining unit work. Since the main business of the employer — the airing of television and radio programs — continued uncurtailed, we cannot say that the board was in error in finding that there was no "stoppage of work."

2. Westinghouse finally contends that a construction of the phrase "stoppage of work" so as to make benefit payments contingent on the state of the employer's operations raises potential problems of encroachment into the field preempted by Federal labor policy, and hence should be avoided. This preemption question is more squarely presented in an ongoing Federal case between these same

378 Mass. 51                                                    57

Westinghouse Broadcasting Co., Inc. *v.* Director of the Div. of Employment Security.

parties (*Westinghouse Broadcasting Co.* v. *Common-wealth*, C.A. No. 76-1409-S) and we make no attempt to decide it here. We note, however, that the United States Supreme Court decided very recently that the unemployment compensation statute of New York which awards benefits to strikers after a seven-week waiting period, raises no preemption problems, because "Congress has decided to tolerate a substantial measure of diversity" by the States in this area. *New York Tel. Co.* v. *New York State Dep't of Labor*, 440 U.S. 519, 546 (1979). In view of that decision, we do not feel required to alter our construction of the phrase "stoppage of work."

3. The claimant employees agree that there was no "stoppage of work," and therefore no ground for disqualification under G. L. c. 151A, § 25 (*b*), but seek an additional ruling that in any event an "offensive lockout" of the type allegedly instituted by the company here cannot be the basis for depriving nonworking employees of their eligibility for benefits. We recognize that the purpose of the unemployment compensation statutes is to assist those who are involuntarily thrown out of work, *General Elec. Co.* v. *Director of the Div. of Employment Security*, 349 Mass. 207, 210 (1965), *Howes Bros.* v. *Unemployment Compensation Comm'n*, 296 Mass. 275, 282 (1936), and that employees who are, without provocation, locked out of their jobs may be involuntarily unemployed in such a way as to distinguish them from others, for example strikers, who voluntarily leave work due to a labor dispute. See *Bunny's Waffle Shop, Inc.* v. *California Employment Comm'n*, 24 Cal. 2d 735 (1944); *Brechu* v. *Rapid Transit Co.*, 20 Conn. Supp. 209 (1957); *Bootz Mfg. Co.* v. *Review Bd. of Employment Security Div.*, 143 Ind. App. 17 (1968); *National Gypsum Co.* v. *Administrator, La. Dep't of Employment Security*, 313 So. 2d 230 (La. 1975). However, since there was no "stoppage of work" here, there was no need even to reach the question of the nature of the underlying labor dispute, and the board quite properly did not rest its conclusion on that basis.

There is no reason for us to decide now whether an "offensive lockout" resulting in a "stoppage of work" as defined above can ever be the basis for a disqualification for unemployment benefits. We reserve that question for an appropriate case in which it may be presented. On the facts of this particular case, we affirm the award of benefits for the reason given by the board—namely, that there was no "stoppage of work."

*Decision of the Municipal Court affirmed.*