MICHAEL S. BOGUSZEWSKI & others[1] *vs.* COMMISSIONER OF
THE DEPARTMENT OF EMPLOYMENT AND TRAINING
& another[2].

Suffolk. April 3, 1991. - June 5, 1991.

Present: LIACOS, C.J., ABRAMS, LYNCH, & GREANEY, JJ.

*Employment Security*, Stoppage of work through labor dispute. *Administrative Law*, Judicial review. *Words*, "Stoppage of work."

Substantial evidence supported the conclusions of the board of review of
the Division of Employment Security that there was a "stoppage of
work" due to a labor dispute between an electric utility company and
its employees and that, therefore, the striking employees were not enti-
tled to unemployment benefits under G. L. c. 151A, § 25 (*b*); moreover,
the board's determination that a "stoppage of work" existed was
neither arbitrary nor based on an error of law. [344-346]

CIVIL ACTION commenced in the Boston Municipal Court
Department on August 19, 1987.

The case was heard by *Charles R. Johnson*, J., and ques-
tions of law were reported by him to the Appeals Court. The
Supreme Judicial Court granted a request for direct review.

*Deborah S. Steenland* for Boston Edison Company.

*Burton E. Rosenthal* (*Joanne F. Goldstein* with him) for
the employee.

*Robert J. Cordy*, Special Assistant Attorney General, &
*Kenneth B. Grooms*, Special Assistant Attorney General, for
the Commissioner of the Department of Employment and
Training, joined in a brief.

[1] 2,950 employees of Boston Edison Company.
[2] Boston Edison Company.

*Scott Harshbarger*, Attorney General, & *Maria Galvagna*, Assistant Attorney General, for the Attorney General, amicus curiae, submitted a brief.

GREANEY, J. The board of review of the Division of Employment Security[3] (board) concluded that a "stoppage of work" had occurred when two-thirds of the employees of Boston Edison Company (employer) ceased to work during a four-week strike. The board determined, therefore, that the striking employees were not entitled to unemployment benefits under G. L. c. 151A, § 25 (*b*) (1988 ed.), the Employment Security Law. A judge of the Boston Municipal Court reviewed the board's decision under G. L. c. 30A, § 14 (1988 ed.), determined that the decision was wrong, and concluded that the claimants were entitled to benefits. The judge reported the questions raised by the appeal and the correctness of his decision to the Appeals Court. We allowed an application for direct appellate review. We conclude that the board's decision that there was a "stoppage of work" under the statute, even though the employer continued full production and lost no revenues as a result of the strike, was consistent with the law and was supported by substantial evidence. Consequently, we direct the entry of a judgment affirming the board's decision denying benefits.[4]

The employer is an operating public utility engaged principally in the generation, purchase, transmission, distribution, and sale of electricity. As of May, 1986, the employer had 4,397 full-time employees. Approximately 2,950 of the employees, the claimants, were represented by locals of the Utility Workers Union of America. Collective bargaining agreements between the unions and the employer expired on May 15, 1986. The parties failed to reach new agreements by that date, and the claimants initiated a strike, which commenced on May 16, 1986. All of the approximately 1,450 manage-

---

[3]By St. 1990, c. 177, § 247, the name of the agency was changed to Department of Employment and Training.

[4]We acknowledge the brief of the Attorney General, which was submitted as amicus curiae in connection with this case.

ment and nonunion employees continued working, with substantially extended hours. The strike ended four weeks later, on June 13, 1986, when new agreements were reached and the claimants returned to work.

During the strike, many of the company's operations were halted, or performed at a level substantially below normal. The board described the state of the operations in extensive and detailed findings regarding the disruption that occurred in each of the employer's many divisions. For example, in the overhead transmission system division, where 130 nonunion workers did the work of 423 striking workers, no routine maintenance, inspection, street light fixture replacement, and system development were performed. In addition, other important functions of the division, such as lamp inspection, pole installation and replacement, transformer installation, overhead service installation, and wire installation, were performed at rates ranging from 3% to 41% of normal performance.

The board summarized the disruption caused by the strike as follows:

> "[A]mong other things, major portions of the Transmission & Distribution function were curtailed, and much of the vital reliability, safety and sales work was disrupted to a level substantially below normal; and . . . much of the customary maintenance of premises and equipment, the inspection, testing, installation, replacement of equipment, and clerical and administrative functions normally performed in most of the [employer's] departments either were not accomplished during the dispute or were accomplished at levels ranging from about 3% to 50% of normal."

In two of the employer's divisions — the transportation division and the data input and control division — work was placed out on contract to outside vendors.

While this disruption was occurring, however, the employer was able to maintain 100% of its generation and distribution of electricity to customers.

In addition, with management and nonunion employees working fifty to eighty hours per week, the employer was able to answer service calls and perform emergency repair work on electrical lines and associated equipment. The employer was also able to process customer billings and payments for the electricity. As a result, the employer's revenues did not suffer during the strike, and the value of its common stock actually increased.

The claimants applied for unemployment benefits with the Division of Employment Security (DES) for the four weeks of the strike. The Director of DES awarded benefits, and the employer requested review before the board. After six days of hearings, a majority of the board found that the claimants were not entitled to benefits, as their unemployment was due to a "substantial work stoppage" because of a labor dispute. The claimants sought review in the Boston Municipal Court pursuant to G. L. c. 30A, § 14. The judge decided that there had been no "stoppage of work" because the administrative record did not support a conclusion that the employer "suffered any immediate or long-term adverse consequence, financial or otherwise," and because "the employer's primary business function, the for profit generation and distribution of electricity, proceeded without interruption."

The Employment Security Law provides that no unemployment benefits may be paid to an individual for "[a]ny week with respect to which the director finds that his unemployment is due to a stoppage of work which exists because of a labor dispute [at his place of employment]." G. L. c. 151A, § 25 (b). The central question presented by this appeal is whether the term "stoppage of work" refers exclusively to an employer's output and revenues, or may also refer to operations which are not immediately tied to output and revenues, such as maintenance, inspection, testing, installation, and administrative operations. Neither party disputes the board's finding that only the latter were disrupted

by the claimants' strike, while output, emergency service, and customer billing were maintained at normal levels.

The original version of the statute was restrictive toward striking employees, providing that no benefits could be paid to any employee whose unemployment was "directly due to a strike, lockout or other trade dispute still in active progress." St. 1935, c. 479, § 5. The statute was amended in 1937 to include the current language, which narrowed the disqualification provision.[5] St. 1937, c. 421, § 1. Whereas the original version of the statute disqualified all striking employees from receiving benefits, the new version only disqualifies striking employees when the strike causes a "stoppage of work" at the place of employment. See generally *Westinghouse Broadcasting Co., Inc.* v. *Director of the Div. of Employment Sec.*, 378 Mass. 51, 53-54 (1979).[6]

Past cases have attempted no precise definition of the term "stoppage of work," but have instead adopted a general definition which requires a "substantial curtailment" of the employer's "operations." See *Reed Nat'l Corp.* v. *Director of the Div. of Employment Sec.*, 388 Mass. 336, 338 (1983), *S.C.*, 393 Mass. 721 (1985); *Westinghouse, supra* at 55. The claimants rely principally on the *Westinghouse* case to argue that the board is required by law to find a substantial curtailment of the employer's production of electricity in order to

---

[5]We agree with the claimants that the current version of the statute narrowed the labor dispute disqualification in the 1935 version. However, we do not agree that the provision was narrowed to such an extent that it only applies in cases where end production or revenues have been curtailed. In addition, we do not agree that the labor dispute disqualification has been narrowed, through subsequent amendments and case law, to the extent suggested by the claimants. The amendments have created exemptions to the disqualification provision, see, e.g., St. 1941, c. 685; St. 1959, c. 554; St. 1964, c. 355, but they have not modified the definition of "stoppage of work."

[6]For a discussion of the policy considerations underlying the labor dispute disqualification and the "stoppage of work" provision, see Lewis, The "Stoppage of Work" Concept in Labor Dispute Disqualification Jurisprudence, 45 J. Urb. L. 319 (1967); Shadur, Unemployment Benefits and the "Labor Dispute" Disqualification, 17 Univ. of Chi. L. Rev. 294, 296-300 (1950).

make a determination that a labor dispute caused a "stoppage of work." Our holding in *Westinghouse*, however, was based principally on deference to a supported administrative finding, and did not establish any required elements of a "stoppage of work."[7]

The claimants' argument is refuted by an earlier case, *General Elec. Co. v. Director of the Div. of Employment Sec.*, 349 Mass. 358 (1965), which illustrates that there may be a "stoppage of work" even when "production continue[s] at the same rate at which it existed prior to the strike." *Id.* at 360.[8] Cases construing G. L. c. 151A, § 25 (*b*), have focused on the totality of the employer's operations, and have never made curtailment of production or revenues a necessary element for invoking the labor dispute disqualification. As stated generally in an early case, "where a labor dispute blocks a substantial amount of work which would otherwise

---

[7] In *Westinghouse, supra*, we upheld a board decision that no "stoppage of work" occurred when sixty-nine employees of a radio and television broadcasting company were locked out of their jobs by their employer. The board had based its decision largely upon the fact that "the main business of the employer — the airing of television and radio programs — continued uncurtailed." *Id.* at 56. The employer in that case reassigned employees and hired temporary employees to perform the work that the locked out employees had performed. Despite "evidence that much work normally to be performed . . . went unperformed," *id.* at 55, we held that the board's decision that there was no "stoppage of work" was supported by substantial evidence.

The *Westinghouse* decision showed deference to administrative decision-making, as required under the State Administrative Procedure Act. See G. L. c. 30A, § 14 (7). It did not, however, as the claimants argue, establish a rule that a "stoppage of work" requires a disruption in an employer's output or revenues. The fact that the employer's broadcasting of programs and commercials continued uninterrupted was treated merely as substantial evidence which supported the board's decision.

[8] In *General Electric*, the fact that certain operations were transferred outside of the employer's plant in order to maintain production did not, as the claimants suggest, establish a rule that when production is maintained there can only be a "stoppage of work" when work is transferred off-site. This fact was merely an indication that the normal operations of the employer were materially obstructed. *Id.* at 362. In the case before us, the fact that the employer did not purchase electricity from other utilities, and hired only a minimal number of outside replacements for the strikers, are factors for the board to consider, but are not dispositive.

be done it has stopped that much of the work and is therefore a 'stoppage of work.' " *Adomaitis* v. *Director of the Div. of Employment Sec.*, 334 Mass. 520, 524 (1956).

The approach in most States with similar labor dispute disqualifications is in accord with the *Adomaitis* case. Decisions in these States treat the question whether a "stoppage of work" exists as a determination to be based on the facts involved in each particular case. See Annotation, Construction of Phrase "Stoppage of Work" in Statutory Provision Denying Unemployment Compensation Benefits During Stoppage Resulting from Labor Dispute, 61 A.L.R. 3d 693 (1975). Several courts have declined to treat a curtailment of production as a necessary element of a "stoppage of work." See, e.g., *Travis* v. *Grabiec*, 52 Ill. 2d 175 (1972); *Boone* v. *Department of Labor*, 144 Ill. App. 3d 306 (1986); *Aaron* v. *Review Bd. of Indiana Employment Sec. Div.*, 440 N.E.2d 1 (Ind. Ct. App. 1982);[9] *Laclede Gas Co.* v. *Labor & Indus. Relations Comm'n of Missouri*, 657 S.W.2d 644 (Mo. App. 1983);[10] *Pfenning* v. *Department of Employment & Training*, 151 Vt. 50 (1989); *Whitcomb* v. *Department of Employment & Training*, 147 Vt. 525 (1986); *Acheson* v. *Department of Employment Sec.*, 19 Wash. App. 915 (1978). Cases cited by the claimants, which place primary weight on curtailment of production or revenues, also consider other factors and do not persuade us to adopt the claimants' position.[11]

---

[9]It is true, as the claimants note, that Indiana has amended its statute to remove the words "stoppage of work." However, the facts of this case arose before the amendment went into effect, so the term "stoppage of work" was properly considered. See also *Pierce Governor Co.* v. *Review Bd. of Indiana Employment Sec. Div.*, 426 N.E.2d 700, 703 (Ind. Ct. App. 1981).

[10]This case was based largely on a statute which defined "stoppage of work" as a "substantial diminution of . . . activities, production or services." *Laclede, supra* at 647 n.2. However, the court stated that it could have rendered its holding even without the statutory definition. *Id.* at 650.

[11]See, e.g., *Oil, Chem. & Atomic Workers Union, Local No. 1-1978* v. *Employment Sec. Div. of Alaska Dep't. of Labor*, 659 P.2d 583 (Alaska 1983); *International Bhd. of Elec. Workers, Local 1357* v. *Hawaiian Tel. Co.*, 68 Haw. 316 (1986); *Meadow Gold Dairies-Hawaii, Ltd.* v. *Wiig*, 50

It is significant that in Massachusetts cases, the general definitions of "stoppage of work" refer principally to the employer's "operations." See *Reed, supra* at 338, and 393 Mass. at 722; *Westinghouse, supra* at 55. If "production" is included in a definition, it is put forth either as one factor among many to be considered, or disjunctively with "operations." See *Reed, supra* at 340 (factors to consider are drop in production, decrease in workers, and over-all status of the employer's operations); *General Elec., supra* at 363 & n.4 (dispute must interfere with and diminish "production or operation"); *Westinghouse, supra* at 54 (same). See also Lewis, The "Stoppage of Work" Concept in Labor Dispute Disqualification Jurisprudence, 45 J. Urb. L. 319, 329-333 (1967).

Because of the variety of factual situations in which the labor dispute disqualification may be invoked, we decline to define the term "stoppage of work" any more precisely than it has already been defined in prior cases. See *Westinghouse, supra,* at 56. There are no necessary, specific elements of the definition. The board should continue to follow an empirical approach, evaluating each situation on its facts, and applying the general requirement that there be a "substantial curtailment" of the employer's operations in order for there to be a "stoppage of work." See *Reed, supra* at 338. See also Walsh, A Judicial Guide to Labor and Employment Law, c. 11 at 251 (1990). While output and revenues remain important factors for the board to consider, they will not necessarily be dispositive. "As production increasingly represents less than totality of the employing unit's performance, decreases in business revenue, services rendered, marketing, research, and maintenance, transportation, and construction activities have come to the fore as indicia of substantialness." Lewis, *supra* at 332. See also Shadur, Unemployment Benefits and the "Labor Dispute" Disqualification, 17 U. Chi. L. Rev. 294, 310-312 (1950).

Haw. 225 (1968); *Billings* v. *State Bd. of Labor Appeals,* 204 Mont. 38 (1983); *Cumberland & Allegheny Gas Co.* v. *Hatcher,* 147 W. Va. 630 (1963).

In this case, the board properly considered several factors in reaching its conclusion that there was a "stoppage of work." These factors included that 2,950 employees, or approximately two-thirds of the entire work force, ceased to work during the strike. Along with production of electricity, emergency service, and processing of customer payments, which were all maintained at normal levels during the strike, the board also considered maintenance, inspection, testing, installation, replacement, clerical, and administrative functions, which were all either not performed during the strike or were performed at levels ranging from 3% to 50% of normal.

The board may have also considered significant the fact that the employer in this case is a public utility, which has a duty to the public to maintain production of electricity. See *Weld* v. *Gas & Elec. Light Comm'rs*, 197 Mass. 556 (1908). A manufacturing firm experiencing the same disruption due to a labor dispute might conceivably be more likely to curtail or even halt output of its end product. We are not suggesting an exception or different rule for utilities in these circumstances. However, the board may be justified in weighing the factors differently — for example, by placing more weight on over-all operations than on end production — when it is evident that curtailment of end production in a utility has more significance than similar curtailment by a manufacturing firm. See Lewis, *supra* at 330-331.

"Application of law to fact has long been a matter entrusted to the informed judgment of the board of review." *Director of the Div. of Employment Sec.* v. *Fingerman*, 378 Mass. 461, 463-464 (1979). The board's decision may be reversed if it is based upon an error of law or is unsupported by substantial evidence. See G. L. c. 151A, § 42; G. L. c. 30A, § 14 (7). See also *Westinghouse, supra* at 55; *Reed, supra* at 336; *Garfield* v. *Director of the Div. of Employment Sec.*, 377 Mass. 94, 96 (1979). We conclude that the board did not commit an error of law when it decided that a "stoppage of work" existed in this case even though production and revenues had not been curtailed. A strike by two-thirds of a util-

ity's workers, which led to the cessation or curtailment of maintenance, inspection, testing, installation, replacement, clerical, and administrative functions, constituted substantial evidence to support the board's conclusion.

The claimants also argue that the board's decision was arbitrary under G. L. c. 30A, § 14 (7) (*g*), because it departs from the board's approach in other cases. We disagree. The board decisions cited by the claimants may be distinguished on their facts. In addition, because of the factual approach that the board is required to take in each case, it is unlikely that established expectations regarding the availability of benefits exist to the extent that they could be upset by the board's decision here. Cf. *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 401 Mass. 282, 287 (1987); *Boston Gas Co.* v. *Department of Pub. Utils.*, 367 Mass. 92, 103-104 (1975). The board's decision was well-reasoned and contained detailed findings, and determined a question which is "primarily a question of fact for the board." *Reed, supra* at 339. It was neither arbitrary, based on an error of law, nor unsupported by substantial evidence.

A judgment is to be entered in the Boston Municipal Court affirming the decision of the board.

*So ordered.*