HERTZ CORPORATION *vs.* ACTING DIRECTOR OF THE DIVISION
OF EMPLOYMENT AND TRAINING & others.[1]

No. 99-P-759.

Suffolk. April 10, 2001. - September 5, 2001.

Present: BECK, RAPOZA, & COWIN, JJ.

Further appellate review granted, 435 Mass. 1105 (2001).

*Employment Security,* Eligibility for benefits, Stoppage of work through labor
dispute, Findings. *Words,* "Stoppage of work."

Discussion of G. L. c. 151A, § 25(*b*), providing that unemployment benefits
shall not be paid to an individual for "[a]ny week with respect to which
the commissioner finds that his unemployment is due to a stoppage of
work which exists because of a labor dispute at the factory, establishment
or other premises at which he was last employed," and decisions of the
Supreme Judicial Court that have addressed the meaning of the term
"stoppage of work." [465-468]

This court set aside a decision of the board of review of the Department of
Labor and Workforce Development affirming a decision of the deputy
director of the Division of Employment and Training that there had been
no "stoppage of work" for purposes of G. L. c. 151, § 25(*b*), during a
labor dispute and that, consequently, claimants for unemployment
compensation benefits were entitled to the receipt of the benefits, where
the decision was based upon an error of law and unsupported by substantial
evidence [468-470]; further, this court ordered that a new judgment enter
that a stoppage of work occurred as a result of the labor strike and that the
claimants were not entitled to unemployment benefits for the period in
question [470-471].

CIVIL ACTION commenced in the East Boston Division of the
District Court Department on June 18, 1998.

The case was heard by *Joseph M. Walker, III,* J.

*Barry A. Guryan* for the plaintiff.

*Daniel J. Hammond,* Assistant Attorney General, for Depart-
ment of Labor and Workforce Development.

*Matthew E. Dwyer* for International Brotherhood of Team-
sters, Local 25.

---

[1]Board of review of the Department of Labor and Workforce Development,
and International Brotherhood of Teamsters, Local 25.

COWIN, J. We address the question whether a "stoppage of work," as that term is used in G. L. c. 151A, § 25(*b*), occurred when a labor dispute between International Brotherhood of Teamsters, Local 25, and Hertz Corporation generated a strike lasting six weeks during the summer of 1996. Pursuant to that statute, a finding that a "stoppage of work" occurred would disqualify, for the period of the stoppage, any claimant for unemployment compensation benefits whose unemployment was brought about by the underlying labor dispute. Claiming that such a stoppage had occurred, Hertz challenged the award of unemployment compensation benefits to approximately 130 striking employees.

The deputy director of the Division of Employment and Training found that there had been no stoppage of work for purposes of G. L. c. 151A, § 25(*b*), and determined therefore that the claimants were not disqualified with respect to the receipt of benefits. Upon appeal by Hertz, pursuant to G. L. c. 151A, §§ 40 and 41, the board of review of the Department of Labor and Workforce Development (board) affirmed the decision of the deputy director. Upon a further request by Hertz for judicial review under G. L. c. 151A, § 42, a judge of the District Court affirmed the decision of the board. Hertz filed a timely notice of appeal to this court. We hold that the board[2] applied erroneous criteria in determining that a stoppage of work had not taken place. *Boguszewski* v. *Commissioner of the Dept. of Employment & Training*, 410 Mass. 337, 342-344 (1991). Because the extensive subsidiary findings of the board are supported by substantial evidence,[3] and because an ultimate finding that there was a stoppage of work follows logically therefrom once the correct legal criteria are applied, further administrative action is unnecessary. We therefore vacate the judgment of the District

[2]While the appeal is from the decision of the judge of the District Court, in the present case that decision determined only that the decision of the board was "free of legal error"; was supported "by sufficient and credible evidence"; was "not arbitrary or capricious"; and was "made in conformance with the requirements of M.G. L. c. 30A, § 14(7) and M.G. L. c. 151A, § 42," and that therefore the decision should be affirmed. Consequently, the appeal to this court is essentially a judicial review of the decision of the board.

[3]See G. L. c. 30A, §§ 1(6) and 14(7)(*e*).

Court and order that judgment is to enter that the defendant employees are not entitled to unemployment compensation benefits.

1. *Material facts.* We state material facts drawn from the findings of the board. Hertz, the employer in this proceeding, rents cars and other vehicles to the general public at various locations in the Boston metropolitan area. When two collective bargaining agreements between Hertz and members of the International Brotherhood of Teamsters, Local 25, expired and negotiations for new contracts were unsuccessful, the union went on strike for a period of forty-two days (June 10, 1996, to July 22, 1996). Of the approximately 144 to 156 striking bargaining unit employees, 130 filed claims for unemployment benefits.

During the strike, Hertz used management employees, as well as other employees not affected by the labor dispute, to conduct operations normally carried on by bargaining unit members. As a result, there was apparently no reduction in the number of rentals which Hertz would otherwise have made during the period, and no decrease in the revenues which Hertz would otherwise have realized from such rentals.[4] The board found that Hertz did not experience a "substantial curtailment" in the activity of renting cars and other vehicles, which the board characterized as Hertz's "essential function and basic business activity."

At the same time, the board found that a large variety of the employer's activities were either not performed at all or greatly reduced. Each elimination or reduction of a normal activity came about because managerial and other employees were shifted from their normal job functions and assigned to basic tasks necessary to get vehicles into the hands of customers (including, without limitation, retail counter work; preparation of vehicles; washing vehicles; processing of vehicle returns; driving of shuttle buses; stripping and scraping new vehicles; and limited maintenance work).

---

[4]Hertz presented no evidence of revenues lost from operations as a result of the strike. The board drew no negative inferences from this apparently strategic decision, but given the absence of evidence on the subject, found, properly in our view, that there were no lost revenues.

In summary form, the board made the following findings with respect to Hertz's operations. Normal efforts to maintain an acceptable fleet of vehicles (meaning that cars were available to accommodate customers' needs without having extra cars) were abandoned. Likewise, market planning analysis to determine what quantity and mix of cars to order from manufacturers (done ordinarily at least on a weekly basis) was reduced to a minimal level. Administration of the "yield management pricing system" was reduced by approximately 80 per cent, resulting in failure to adjust rental rates to meet competitive pricing.

Normal planning, analysis and forecasting, including reports thereof, were virtually eliminated. This included, among other things, analysis of financial data and preparation of forecasts of factors underlying rentals; analysis of demand for specialty vehicles; analysis reporting to achieve the goal of renting all available vehicles; and over-all monitoring of operations. Normal accounting functions were not performed. Training and other personnel activities were suspended.

Maintenance suffered. No attention was paid to various maintenance warranty issues that ordinarily were referred to manufacturers. Normal greasing, oil and filter changes, and safety inspections were performed only on a limited basis. Ordinary maintenance of shuttle buses was postponed.

While managers and other employees not affected by the strike replaced striking bargaining unit members at the retail counters, retail operations suffered to a certain extent. Given their lower level of training and experience, the replacement employees were unable to provide the quality and speed of service that Hertz customarily offered. The board expressly found that "[c]ounter operations fell below Hertz's normally acceptable standards." Lines lengthened and customers complained. Cash payments were lost or misplaced. Many replacement employees were unable to operate the computer system properly. Similar problems plagued the handling of returns of vehicles. Shuttle bus service was erratic, thereby generating more customer complaints.

In addition, the retail sale of used cars normally carried on at the company's McLellan Highway location was completely shut

down, and cars normally disposed of by return to the manufacturer, salvage or auction remained in Hertz's inventory. Much of the so-called "back office" work at McLellan Highway was not performed, resulting in late filing of paperwork and the loss of sets of car keys. The company's seasonal operation in Nantucket was affected, since Hertz could not determine an appropriate mix of cars to send to the island; the cars remained in Nantucket because of local regulatory restrictions, and business of the following year was affected because local vehicle permits were based upon vehicles entering during the prior year. Supervisory functions were affected throughout the region. Hertz contracted out its twenty-four hour road service for customers whose rental cars break down.[5]

2. *The statutory standard.* General Laws c. 151A, § 25(*b*), as amended by St. 1993, c. 88, § 1, provides that unemployment benefits shall not be paid to an individual for "[a]ny week with respect to which the commissioner finds that his unemployment is due to *a stoppage of work* which exists because of a labor dispute at the factory, establishment or other premises at which he was last employed . . . ." (Emphasis supplied.) Certain exceptions to the policy are not relevant to the present case. Prior to 1937, the statute disqualified all striking employees with respect to the receipt of benefits. It was then amended to ease the restriction, disqualifying striking employees only when the labor dispute caused a "stoppage of work" at the place of employment. St. 1937, c. 421. *Boguszewski* v. *Commissioner of the Dept. of Employment & Training*, 410 Mass. at 341.[6]

The term "stoppage of work" is not defined in the statute.

---

[5]The board found in addition that a construction project designed to triple available parking at the Logan Airport site had to be postponed, and that award of a contract to reconfigure maintenance garages at the McLellan Highway location was delayed. General Laws c. 151A, § 25(*b*), focuses upon a "stoppage of work" as the condition which triggers the withholding of unemployment benefits. Decisions interpreting the statute examine the extent to which "operations" are affected. *General Electric Co.* v. *Director of the Div. of Employment Security,* 349 Mass. 358, 363 (1965). *Boguszewski* v. *Commissioner of the Dept. of Employment & Training,* 410 Mass. at 341-342. Because capital projects arguably are not "operations," we give no weight to the board's findings regarding these two items.

[6]The statute appears somewhat counter-intuitive, since its effect is that the more effective the strike (i.e., the more likely it is to bring about a stoppage of work), the more likely the strikers are to lose their unemployment compensa-

The Supreme Judicial Court has periodically addressed the meaning of the term, refining the concept so that it is clear that the "work" which is at issue in the concept of "stoppage of work" is the work and operations of the employer, not merely the work of individual employees, and that a "stoppage of work" does not require a complete cessation of the employer's activities. *Adomaitis* v. *Director of the Div. of Employment Security,* 334 Mass. 520, 524 (1956). *General Electric Co.* v. *Director of the Div. of Employment Security,* 349 Mass. 358, 361, 363 (1965). *Boguszewski, supra* at 341-342, 344 ("substantial curtailment"). In the course of this development, the court has identified various considerations which have a bearing upon the determination whether a "stoppage of work" has occurred.[7] Review of the cases follows.

Upholding an interpretation of the board, the Supreme Judicial Court in *Adomaitis, supra* at 524, held that "where a labor dispute blocks a substantial amount of work which would otherwise be done it has stopped that much of the work and there is therefore a 'stoppage of work which exists because of a labor dispute.' " Having determined that a stoppage of work embraced stoppage of "a substantial amount of work" (as opposed to *all* of the work), the court subsequently held that, where a strike forced the employer to "farm out" part of its production in order to avoid substantially greater layoffs and a substantial reduction in production, there could be a stoppage of work even though end product deliveries had not been materially curtailed. *General Electric, supra* at 362. This time reversing the board, the court stated: "The pressure exerted by the strike . . . has prevented the company from having a substantial amount of work performed in its own plant. We think that the statutory language and its apparent policy require us to treat this prevention of work as a 'stoppage of work' within the meaning of § 25(*b*)." *Id.* at 364.

tion benefits. It was suggested at oral argument that the legislative purpose is to prevent the employer from being penalized twice: once by a substantial reduction in its operations, a second time by the impact of unemployment compensation payments and the related effect upon the employer's obligation to contribute to the unemployment compensation trust fund.

[7]These decisions have inspired no response by the Legislature, which has been content to leave the term "stoppage of work" otherwise undefined for sixty-four years.

Notwithstanding the court's earlier treatment of the absence of a material curtailment in end product deliveries as not by itself determinative in the analysis of whether there has been a stoppage of work, the court thereafter upheld a finding that there was no stoppage at a combined radio and television station where the station continued normal levels of broadcasting (except for short periods when there were power failures) and where all Federal Communications Commission requirements were satisfied despite the labor dispute. *Westinghouse Broadcasting Co.* v. *Director of the Div. of Employment Security*, 378 Mass. 51, 53, 56 (1979). Consistent with *Adomaitis* and *General Electric*, the court identified the proper inquiry to be "whether the employer's operations were substantially curtailed as the result of a labor dispute." *Westinghouse, supra* at 55. However, it then accepted the conclusion of the board that there had been no substantial curtailment of the employer's operations because there had been neither a drop in production nor the farming out of bargaining unit work. *Id.* at 56.

The *Westinghouse* case, with its emphasis upon ultimate production and the farming out of work, was reconciled with other cases in *Boguszewski, supra.* There, the court treated the *Westinghouse* decision as showing "deference to administrative decision-making," but explained that the decision did not "establish a rule that a 'stoppage of work' requires a disruption in an employer's output or revenues." 410 Mass. at 342 n.7. The *Boguszewski* opinion provides a statement of applicable principles leading us to our conclusion that the board erred in the present case.

Building upon *Adomaitis* and *General Electric*, the court in *Boguszewski* stated: "Past cases have attempted no precise definition of the term 'stoppage of work,' but have instead adopted a general definition which requires a 'substantial curtailment' of the employer's 'operations.' " *Boguszewski, supra* at 341. It is the "totality" of those "operations" upon which the relevant inquiry focuses, and cases construing § 25(*b*) "have never made curtailment of production or revenues a necessary element for invoking the labor dispute disqualification." *Id.* at 342. Thus, "[w]hile output and revenues remain important factors for the board to consider, they will not necessarily be

dispositive." *Id.* at 344. The court reinstated the board's decision and reversed the judge, who had concluded that there had been no stoppage of work because the employer had suffered no "immediate or long-term adverse consequence, financial or otherwise," and because "the employer's primary business function . . . proceeded without interruption." *Id.* at 340. Acknowledging that the employer, an electric utility, had maintained 100 per cent of its generation and distribution services, the court determined that "the cessation or curtailment of maintenance, inspection, testing, installation, replacement, clerical, and administrative functions, constituted substantial evidence to support the board's conclusion" that a stoppage of work had occurred. *Id.* at 340, 346.

3. *Application of the statutory standard.* In the present case, the subsidiary findings of the board are supported by substantial evidence and are not challenged by the parties. The question for decision is whether the board's ultimate finding that there was no stoppage of work is "[b]ased upon an error of law" or otherwise "[u]nsupported by substantial evidence." G. L. c. 30A, § 14(7)(*c*) and (*e*), as amended by St. 1973, c. 1114, § 3. Here, the board in its conclusions of law correctly phrased the governing standard, stating that the proper inquiry in determining whether there has been a stoppage of work for the purposes of G. L. c. 151A, § 25(*b*), is "whether the employer's operations were substantially curtailed as the result of a labor dispute." *Westinghouse*, 378 Mass. at 55. The board also correctly cited *Adomaitis*, 334 Mass. at 524, which defined a work stoppage as existing "where a labor dispute blocks a substantial amount of work which would otherwise be done."

However, we agree with Hertz that the board then implicitly altered these principles in its application of them to the facts of the case (as set forth in the board's own subsidiary findings). The board concluded "that the normal activities and daily operations of the employing unit were not substantially curtailed because of the labor dispute." In support thereof, the board noted that "Hertz continued its essential function and basic business activity of renting cars and other vehicles, and there was no substantial evidence presented that Hertz suffered a substantial curtailment *of that activity*" (emphasis supplied).

The board also cited stable rentals and revenues; no increase in customer complaints (but contrast the board's own subsidiary findings to the contrary); no reduction in "hours of operation"; no financial loss from delay of two construction projects (see note 5 above); and minimal loss at the Nantucket facility and at the used car location at McLellan Highway. Accordingly, the board concluded that, "while some of the functions normally performed by both management and bargaining unit positions were diminished because of the labor dispute, there was no substantial evidence that there was a decrease in rentals or revenues and . . . the minor reduction in . . . back office operations did not constitute a substantial work stoppage because of the dispute."

In focusing almost exclusively upon what it considered to be the employer's "essential function and basic business activity," and in measuring that function principally on the basis of vehicles rented, hours devoted to such rentals and the absence of losses, the board disregarded the principle that the analysis called for by G. L. c. 151A, § 25(*b*), must consider "the totality of the employer's operations, and [has] never made curtailment of production or revenues a necessary element for invoking the labor dispute disqualification." *Boguszewski*, 410 Mass. at 342. "Operations" are not limited to production, which is one factor among many to be considered. *Id.* at 344. See *General Electric*, 349 Mass. at 363-364, concluding that a stoppage of work had occurred even given "the absence of a substantial and continuing disruption of end product deliveries."

In placing what we believe was undue emphasis upon rentals and revenues, the board gave insufficient weight to — and in some respects contradicted — its own subsidiary findings. Those findings demonstrate that Hertz experienced cessation of, or substantial reduction in, a variety of its normal functions. These included activities involving market planning, fleet management, accounting, budgeting, pricing, maintenance, financial analysis, road service (which was contracted out, compare *id.* at 362), retail sales and other vehicle dispositions, training, employee relations, and necessary record keeping and paperwork. The board's inattention to the significance of these aspects of the employer's business is inconsistent with the

requirement that the inquiry focus upon the totality of the employer's operations.

The board argues that the *Westinghouse* case stands for the proposition that it is the "main business" of the employer that is at issue, and that *Boguszewski* merely expands the definition of "main business" because a utility company was involved. This argument ignores those cases (*Adomaitis, General Electric, Boguszewski*) which make it clear that attention must be paid to *all* of the employer's operations in deciding whether there has been a stoppage of work under § 25(*b*). The Supreme Judicial Court has rejected the idea that curtailment of production or revenues is a necessary element. *Boguszewski, supra* at 342. Likewise, the court has expressly stated that there is no special rule for utility companies. *Id.* at 345. The nature of the company involved does not alter the general criteria to be considered.[8]

We are mindful of the deference normally accorded to administrative findings. *Id.* at 342. Here the board's subsidiary findings are not challenged. However, the board applied to those findings an erroneous view of applicable law, thereby generating an ultimate finding (i.e., no stoppage of work) that is not supported by its own subsidiary findings. The decision must consequently be set aside both because it is based upon an error of law (G. L. c. 30A, § 14[7][*c*]) and because it is unsupported by substantial evidence (G. L. c. 30A, § 14[7][*e*]).

4. *Disposition.* A reviewing court "may affirm the decision of the agency, or remand the matter for further proceedings before the agency; or the court may set aside or modify the decision, or compel any action unlawfully withheld or unreasonably delayed . . . ." G. L. c. 30A, § 14(7). Here, further action by the board serves no purpose. With the proper legal standard applied, the board's subsidiary findings require a determination that there was a stoppage of work as that term is used in G. L. c. 151A, § 25(*b*). The judgment of the District Court is vacated. A new judgment is to enter that a stoppage of work occurred as

_____

[8]The suggestion at oral argument that the "operations" to be examined in deciding whether there has been a stoppage of work are those of bargaining unit employees only has support neither in the statute nor in the cases, the latter making it abundantly clear that all of the employer's operations must be considered.

a result of the labor strike, and the defendant employees are not entitled to unemployment benefits for the period of June 10, 1996, to July 22, 1996.

*So ordered.*