## Margaret Whitcomb, et al.; John Ricciarelli, et al.; Geraldine Kimball, et al.; Mary S. Butterfield and Rosalind Kemp v. Department of Employment and Training

[520 A.2d 602]

No. 84-378

Present: **Allen, C.J., Hill, Peck, Gibson and Hayes, JJ.**

Opinion Filed December 12, 1986

*Vincent Illuzzi*, Orleans, for Plaintiffs-Appellants.

*Christopher M. Bennett, William J. McDonald,* and *David F. Johnson*, Boston, Massachusetts, for Defendant-Appellee.

**Peck, J.** This is an appeal from a decision of the Vermont Employment Security Board denying unemployment compensation benefits to striking employees of New England Telephone and Telegraph Company (NET). We affirm.

Claimants, members of the International Brotherhood of Electrical Workers (IBEW), had a collective bargaining agreement with their employer, which terminated August 6, 1983. Prior to the expiration of the agreement, the parties began collective bar-

gaining but reached no new agreement. On the day the agreement terminated, IBEW called a strike. Over a thousand employees participated in the strike, which lasted until August 25, 1983, when a new agreement was made. Claimants, members of the striking employees, filed for unemployment compensation benefits.

The Board determined that they were not eligible for benefits because their unemployment was due to "a stoppage of work which exists because of a labor dispute" in which the claimants were directly interested pursuant to 21 V.S.A. § 1344(a)(4). On appeal claimants argue that the Board erred in its conclusion as to a stoppage of work because it failed to consider their claim that the company lost no revenues and that only three percent of its services were affected.

This Court indicated in a 1982 decision that "stoppage of work" refers to a substantial curtailment of the employer's operations, see *Trapeni* v. *Department of Employment Security*, 142 Vt. 317, 320, 455 A.2d 329, 330 (1982), but we have not previously considered what constitutes substantial curtailment. In *Trapeni*, the employer, the publisher of the *Rutland Daily Herald*, was able to publish its newspaper on a daily basis despite a strike by the employees. There was no substantial curtailment of its operations, and this Court affirmed the grant of unemployment benefits to the striking workers. *Id.*

Therefore, under the statutory scheme and our analysis in *Trapeni*, a significant effect on the employer's operations is a prerequisite to denying benefits where unemployment is due to a labor dispute. Conversely, if the employer is unaffected by the employees' use of the economic weapon of a strike, then "the unemployed strikers should be treated no differently than any other unemployed workers." Shadur, *Unemployment Benefits and the "Labor Dispute" Disqualification*, 17 U. Chi. L. Rev. 294, 309 (1950).

Generally, the determination of substantial curtailment must depend upon the facts and circumstances of each case, but among the factors commonly considered are business revenues, production, services and worker hours before and during the strike. See, e.g., *Oil, Chemical & Atomic Workers Union, Local # 1-1978* v. *Employment Security Division*, 659 P.2d 583, 592-93 (Alaska 1983); *Mountain States Tel. & Tel. Co.* v. *Sakrison*, 71 Ariz. 219, 225, 225 P.2d 707, 712 (1950); Shadur, *Unemployment Benefits*

*and the "Labor Dispute" Disqualification, supra,* 17 U. Chi. L. Rev. at 310-11.

Here, the Board examined the services of NET and found that telephone service to customers was not significantly affected, due to automation and computerization. Billing and payment to employees and vendors were not curtailed at all. Service activity was actually slightly higher on the last day of the strike than it was on the first day after the strike had ended. However, the Board found that certain of the employer's activities were completely halted. These included statistical reports of station activity, studies required for settlement, calling card investigation work, toll fraud investigation and divestiture implementation planning. Other activities such as construction, equipment installation and facilities testing were largely suspended during the strike. The Board stated that the evidence demonstrated that a backlog of installation orders was increased by as much as 3,000%. Calls requiring operator assistance were also found to have been hampered.

The Board also examined the number of worker hours and found that the number decreased by 61%. This finding appears to be derived from the fact that 270 management personnel were transferred to work in positions left vacant by 1,002 striking employees.

The Board, however, made no relevant findings on a decrease in revenues. It did mention that product sales decreased by between 23 and 100%, reflecting a significant decrease in the company's marketing operations. The Board's conclusion that there was substantial curtailment of the employer's operations was based, in part, on its view that making a broad examination of *all* the work performed by the employer was preferable to looking only to production or primary services.

The broad perspective adopted by the Board recognizes that "there has been a new emphasis placed upon the term 'operations.' As production increasingly represents less than totality of the employing unit's performance, decreases in business revenue, services rendered, marketing, research, and maintenance, transportation, and construction activities have come to the fore as indicia of substantialness." Lewis, *The "Stoppage of Work" Concept in Labor Dispute Disqualification Jurisprudence,* 45 U. Det. J. Urb. L. 319, 332 (1967).

█ The issue in this case is whether, in the absence of a showing that there had been a decrease in two of the factors commonly considered, business revenues and primary service, significant decreases and limitations in the other areas of the employer's operations constituted substantial curtailment. The Board stated:

Despite the employer's efforts to continue services by transferring some management personnel to cover duties normally performed by the strikers, the record reflects that this skeletal force performing abnormal functions did not achieve normal operations.

We believe that "substantial curtailment" means more than *any* deviation from normal operations. Cf. *Aaron* v. *Review Board of Indiana Employment Security Division*, 440 N.E.2d 1, 3 (Ind. App. 1982). The adjective "substantial" is the key concern. In the matter before us, we hold that the significant curtailment of the functions mentioned above, the decrease in worker hours, the substantial increase in backlogs of installation orders, and the significant delays in calls requiring operator assistance, justified the Board's conclusion that there had been a substantial curtailment of operations.

Claimants also attack the company's evidence which the Board relied upon, as mere estimates. However, even assuming this to be so, claimants had the opportunity to attack these estimates at the hearings below. The Board's findings will be affirmed if supported by any credible evidence in the record to support them. *Darken* v. *Mooney*, 144 Vt. 561, 568, 481 A.2d 407, 412 (1984). The Board was entitled to rely upon the company's submissions. Accordingly, the decision below is without legal fault.

*Affirmed.*