# Wayne E. Pfenning, et al. v. Department of Employment and Training

[522 A.2d 743]

No. 84-507

Present: **Allen, C.J., Hill, Peck, Gibson and Hayes, JJ.**

Opinion Filed December 19, 1986

*Michael T. Schein* of *Hoff, Wilson, Powell & Lang, P.C.*, Burlington, for Plaintiffs-Appellants.

*Brooke Pearson* and *John DeLosa*, Montpelier, for Defendant-Appellee.

**Peck, J.** This is an appeal of a decision of the Vermont Employment Security Board denying unemployment compensation benefits to ninety employees who had been locked out of their

place of employment by their employer, Cone Blanchard Machine Company. We affirm in part and reverse and remand in part.

The claimants in this case, members of United Electrical Workers of America, had a collective bargaining agreement with their employer which terminated in June 1983. Prior to the expiration of the agreement, the company and the union engaged in contract negotiations. When no agreement was reached by the contract termination date, the union agreed to work within the terms of the employer's last contract offer. On November 4, 1983, however, the claimants reported to work and discovered that they had been locked out by their employer. The lockout continued until January 15, 1984, when a new contract was made. Claimants were denied unemployment compensation benefits by the claims examiner, the chief appeals referee, and finally by the Vermont Employment Security Board.

On appeal, the claimants argue that the Board incorrectly applied 21 V.S.A. § 1344(a)(4) (Supp. 1985) for two reasons. First, they contend that there was no stoppage of work and second, that a lockout is not a labor dispute for purposes of § 1344(a)(4).

21 V.S.A. § 1344 provides in part:

(a) An individual shall be disqualified for benefits:

. . . .

(4) For any week with respect to which the commissioner finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he is or was last employed, provided that this division shall not apply if he is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work.

■ We first address the question of whether there was a stoppage of work. The Board concluded that there had been a stoppage of work based, in part, on its finding that production was curtailed by at least ninety-two percent. Claimants attack this finding as clearly erroneous and unsupported by any evidence in the record. As the Board and the claimants correctly note, we have construed stoppage of work to refer to the effect upon the employer's operations rather than the cessation of work by the employees. *Trapeni* v. *Department of Employment Security*, 142 Vt. 317, 322, 455 A.2d 329, 331 (1982).

Stoppage of work means a substantial curtailment of the employer's operations, *id.* at 323, 455 A.2d at 332. Factors proper for consideration in resolving the question include a comparison of business revenues, production or services, and worker hours before and during the strike. *Whitcomb* v. *Department of Employment & Training,* 147 Vt. 525, 526, 520 A.2d 602, 603 (1986).

In the present case, the record discloses that the Board's figure of ninety-two percent curtailment was derived from the testimony of the employer's Director of Industrial Relations, who based his calculations on the number of employees locked out and the number of employees who substituted for them. This figure relates to the number of worker hours, not to the curtailment of production. If the Board's conclusion that a stoppage of work occurred is to stand, there must be other findings which support a substantial curtailment in such things as production and revenues.

The Board did make some findings relating to the employer's production. Its findings may be summarized as follows: It found that the employer was engaged in the manufacture of industrial machinery in a number of plants within and without this country; during the lockout, several machines were shipped from one of the employer's foreign plants to the plant involved in this case; the employer was able to clean and test run these machines and ship them to customers. In addition, the Board found that several machines which had been substantially completed before the lockout were finished by the employer and shipped out. The Board further found that no new manufacturing took place during the lockout.

Claimants argue that these findings contain error, and obscure the fact that despite the cut in work force, the employer was able to ship out ten to eleven machines, six to seven of which were assembled to some degree during the lockout, and that this number of machines shipped was not below the normal range of what it shipped during the two and one-half month period prior to the lockout. The record discloses that the Director of Industrial Relations was asked how many machines this plant would normally ship in two and one-half months (the length of the lockout). He answered, "I've seen months where we've had as many as . . . seven or eight on the top and maybe four-six at the bottom . . . ." The record reveals uncontested evidence that six or seven machines were assembled and shipped out during the lockout, in addition to the four that were test run before shipping. From this

testimony it is not clear that the employer's production was substantially curtailed. Furthermore, there were no findings on curtailment of revenues. Because the evidence on substantial curtailment of the employer's operations is insufficient to support the Board's conclusion, we must reverse and remand. See *Reed National Corp.* v. *Director of Division of Employment Security*, 388 Mass. 336, 340-41, 446 N.E.2d 398, 400 (1983). "The Employment Security Board has the option at all times of deciding a matter on the record of the evidence heard by the referee, or of supplementing that record by hearing further evidence on its own, 21 V.S.A. §§ 1332, 1349." *Davis* v. *Department of Employment Security*, 140 Vt. 269, 275, 438 A.2d 375, 379 (1981). In this case, the Board may direct the parties to submit further evidence sufficient for an adjudication on the issue of substantial curtailment, which may include evidence relating to revenues and production.

The second issue raised by claimants is whether a lockout constitutes a labor dispute for purposes of 21 V.S.A. § 1344(a)(4). Claimants contend that the Board erred in its determination that the present lockout was a labor dispute because the parties were still negotiating, no impasse had occurred, and the employees were ready and willing to work.

Our statute does not define "labor dispute." The Department relies upon a phrase in another subsection for its argument that a lockout was intended to be a species within the genus labor dispute. That section, 21 V.S.A. § 1344(a)(2)(E)(i), provides that an individual shall not be disqualified for benefits for refusing to accept work "[i]f the position offered is vacant due directly to a strike, lockout or *other* dispute." (Emphasis added). The Department argues that by using the phrase "other dispute" after enumerating a strike and a lockout, the legislature has indicated that a labor dispute encompasses a lockout as well as a strike. This same argument has been approved by many courts. See, e.g., *Unemployment Compensation Commission* v. *Aragon*, 329 U.S. 143, 150-51 (1946); *Buchholz* v. *Cummins*, 6 Ill. 2d 382, 387, 128 N.E.2d 900, 903 (1955); *Adams* v. *Industrial Commission*, 490 S.W.2d 77, 80 (Mo. 1973); *In re Usery*, 31 N.C. App. 703, 707, 230 S.E.2d 585, 588 (1976); *Wellborn Paint Manufacturing Co.* v. *New Mexico Employment Security Department*, 101 N.M. 534, 537-38, 685 P.2d 389, 392 (N.M. Ct. App. 1984); see also Shadur, *Unemployment Benefits and the "Labor Dispute" Disqualification*, 17 U. Chi. L. Rev. 294, 300 (1950). The Department argues

further that our statute does not expressly exempt lockouts from the labor dispute disqualification as do the statutes of some states. See, e.g., Md. Ann. Code of 1957, art. 95A, § 6(e); Pa. Stat. Ann. tit. 43, § 802(d) (Purdon 1964); Conn. Gen. Stat. Ann. § 31-236(3)(c) (West 1972 and Supp. 1985).

■ We think the plain meaning of "labor dispute" is broad enough to encompass a lockout, and the phrase in 21 V.S.A. § 1344(a)(2)(E)(i) "lockout or other dispute" indicates legislative intent to include lockout in the term "dispute" in § 1344(a)(4).

Claimants further argue that the policy of the Act is to compensate involuntary unemployment, and, as the claimants were locked out against their will when they were ready to work, they should receive benefits. Although we agree that the general policy of the Act is to compensate those who are unemployed due to no fault of their own, we recognize that the labor dispute disqualification is an exception which does not embody the concept of voluntariness. In *Trapeni, supra,* 142 Vt. at 320, 455 A.2d at 330, we upheld the payment of benefits to striking employees where there was no stoppage of work. The voluntary act of striking was not a bar to the receipt of benefits. Distinguishing between the Act's voluntary leaving disqualification, § 1344(a)(2)(A), and the labor dispute disqualification, we noted that the legislature "must have intended that a person who left work because of a labor dispute be treated differently than one who left for other reasons and without good cause attributable to the employer." *Id.* at 324, 455 A.2d at 332. Under the statutory scheme and the analysis in *Trapeni,* both striking and locked out employees could receive benefits if the employer's operations were not substantially curtailed. Therefore, voluntariness is not the test for the labor dispute disqualification. Under existing Vermont law the phrase "labor dispute" encompasses a lockout.

*Affirmed in part; reversed and remanded in part.*