# Wayne E. Pfenning v. Department of Employment and Training

[557 A.2d 897]

No. 87-397

Present: **Allen, C.J., Peck, Gibson and Dooley, JJ., and Keyser, J. (Ret.), Specially Assigned**

Opinion Filed January 27, 1989

*Michael T. Schein* of *Hoff, Wilson, Powell & Lang, P.C.*, Burlington, for Plaintiffs-Appellants.

*Brooke Pearson*, Montpelier, for Defendant-Appellee.

**Dooley, J.** This appeal from a decision of the Vermont Employment Security Board (Board) comes here a second time, following our partial reversal and remand in *Pfenning* v. *Department of Employment & Training*, 147 Vt. 533, 522 A.2d 743 (1986) ("Pfenning I"). We now affirm.

The facts are related in part in *Pfenning I,* which like the present case concerned claimants' eligibility for benefits during a lockout by their employer from November 4, 1983 to January 15, 1984. In that decision, we rejected claimants' argument that a lockout was not a "labor dispute" within the meaning of 21 V.S.A. § 1344, the provision enumerating disqualifications for benefits. 147 Vt. at 537, 522 A.2d at 746. We agreed with claimants, however, that evidence limited to the reduction in the number of worker hours was insufficient to support a conclusion that there had been a "stoppage of work" within the meaning of the statute.

Citing *Trapeni* v. *Department of Employment Security,* 142 Vt. 317, 323, 455 A.2d 329, 332 (1982), and *Whitcomb* v. *Department of Employment & Training,* 147 Vt. 525, 526, 520 A.2d 602, 603 (1986), we noted that "[s]toppage of work means a substantial curtailment of the employer's operations . . . . Factors proper for consideration in resolving the question include a comparison of business revenues, production or services, and worker hours before and during the strike." 147 Vt. at 535, 522 A.2d at 744. The fault we found with the Board's decision in *Pfenning I* was that it calculated the curtailment of production percentage by using the figures for the reduction in worker hours, making that percentage decline the sole factor in determining the existence of a "work stoppage." We added that "[i]f the Board's conclusion that a stoppage of work occurred is to stand, there must be other findings which support a substantial curtailment in such things as production and revenues." 147 Vt. at 535, 522 A.2d at 744-45.

On remand, the Board sent the case back to the referee for further fact finding consistent with our decision. Further evidence was taken, and the referee issued a new decision based on that evidence again concluding that a stoppage of work had occurred. The referee rejected two measures of "substantial curtailment" advanced by the claimants. He rejected production output as a measure because the product involved is machines that take six to eighteen months to produce while the labor dispute lasted only a little over two months. Thus. the referee gave little weight to the fact that the employer's shipments of finished machines did not decline during the labor dispute. Similarly, the referee rejected the use of sales revenue as measure because the employer was paid only on the delivery of a finished machine. Thus, sales revenues mirrored production output and did not show an unusual decline during the labor dispute. Instead, the referee adopted average daily machining operations as the most important measure of the employer's overall operations. Since the number of these machining operations declined greatly during the labor dispute, although a small number of operations were done by management and nonbargaining unit personnel, the referee found a substantial curtailment in the employer's operations and, therefore, a "work stoppage."

The Board adopted the referee's decision essentially for the reasons given by the referee. It found that "a comparison of the number of machining operations before and during the lockout is

a much more accurate and meaningful indicator than a comparison of the number of completed machines actually shipped." While it concluded that some financial impact is normally required for a stoppage of work to be found, it stated that the requirement cannot be absolute: "As we see it, there are cases in which this general rule is unworkable and inapplicable, and this is one such case." Based on this reasoning, it affirmed the referee and denied benefits to the claimants.

In this Court, claimants argue that the Board ignored our earlier decision and once more based its decision on the single factor of decline in worker hours during the lockout since the decline in daily machining operations necessarily reflected the decrease in worker hours, or nearly so. While we recognize the force of claimants' argument and agree that this case falls close to the line, we cannot accept the claimants' position for three main reasons.

■ First, the question of whether there has been "substantial curtailment" of the employer's operations must depend upon the facts and circumstances of each case. *Whitcomb* v. *Department of Employment & Training,* 147 Vt. at 526, 520 A.2d at 603. Further, it is essentially one of fact. See *Shell Oil Co.* v. *Brooks,* 88 Wash. 2d 909, 915, 567 P.2d 1132, 1135 (1977). As such, we must uphold the Board's factual conclusion unless we conclude that its findings of fact are clearly erroneous. *Delneo* v. *Department of Employment & Training,* 148 Vt. 388, 390, 533 A.2d 1190, 1191 (1987). Further, we must in this area of technical expertise accord to the Board discretion with which to address the issue before it. See *Cross* v. *Department of Employment & Training,* 147 Vt. 634, 636, 523 A.2d 1247, 1249 (1987). While we will overturn a Board decision, as in *Pfenning I,* where we find the evidence is wholly insufficient to allow the Board to reach the conclusion it did, we must uphold the decision of the Board if it is fairly within the discretion granted to it.

■ Second, we believe that the Board's method of measuring the degree of curtailment of the operations of the employer is consistent with the precedents of this and other courts in this area. We particularly note the observations of the Supreme Court of Illinois in *Travis* v. *Grabiec,* 52 Ill. 2d 175, 287 N.E.2d 468 (1972):

We are also of the opinion that the position . . . which looks only at gross production without regard to the means

by which that production is achieved or the continuing disruption of the normal operating methods of the employer, does not reflect the intention of the legislature. Since there is no single pattern or mold which can confine all aspects of all of the varied types of industrial and commercial enterprises and all of the labor disputes in which they and their employees may become involved, it is not surprising that it is difficult to capture all of the variables in a single word or phrase. It may be that there are some situations in which normal operations can be measured accurately enough in terms of gross production. But there are other situations in which a myopic concern with production to the exclusion of the consideration of all other aspects of the enterprise can result in gross distortion.

*Id.* at 178-80, 287 N.E.2d at 470. In *Whitcomb* v. *Department of Employment & Training*, 147 Vt. at 528, 520 A.2d at 604, we upheld the Board's determination that there was a stoppage of work in a telephone company despite the absence of evidence of a decline in business revenue or primary service. Our affirmance was based on extensive findings of curtailment in other parts of the employer's operation — such as equipment installation and operator-assisted calls — combined with a decrease in worker hours. We quoted with approval a law review article that took a broad view of the operations of an employer so that substantial curtailment could be found in activities like "services rendered, marketing, research, and maintenance, transportation, and construction activities." Lewis, *The "Stoppage of Work" Concept in Labor Dispute Disqualification Jurisprudence,* 45 U. Det. J. Urb. L. 319, 332 (1967).

Finally, we cannot accept the claimants' view that the Board's decision in this case is a wholesale evasion of the views we expressed in *Pfenning I*. It may be in this case that the decline in worker hours was proportionately reflected in a decline in machining operations, but that proportionality is not necessarily true for other businesses. See, e.g., *Whitcomb*, 147 Vt. at 527, 520 A.2d at 603-04 (telephone service not affected by decline in worker hours, due to automation and computerization). Consequently, the Board's analysis of machining operations was not redundant. And while we agree that determining production by calculating the number of machining operations may not be typical,

the Board took pains to justify its reliance on that criterion because of the long production cycle and the small number of units sold. The Board further found that the drop in the number of machining operations would affect "the manufacture of new machines in the future," although it could not specify the extent of the future decline in output or revenues.

We remanded this matter in order for the Board to make a more thorough assessment of the economic effects of the lockout, and the Board has used its expertise to do so. Its outcome is plausible and should be accorded strong credence on appeal. *Ellis* v. *Department of Employment Security*, 133 Vt. 533, 536, 346 A.2d 221, 223 (1975).

*Affirmed.*