NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

—————————————

Department of Employment Security
No. 2017-0362

APPEAL OF FAIRPOINT LOGISTICS, INC. & a.
(New Hampshire Department of Employment Security)

Argued: April 12, 2018
Opinion Issued: September 28, 2018

Devine, Millimet & Branch, P.A., of Manchester (Daniel E. Will on the brief), and Seyfarth Shaw LLP, of Boston, Massachusetts (Arthur Telegen and Timothy J. Buckley on the brief, and Mr. Telegen orally), for the petitioners.

Nolan Perroni, P.C., of North Chelmsford, Massachusetts (Peter J. Perroni on the brief and orally), for Claimants Represented by International Brotherhood of Electrical Workers, Local 2320, AFL-CIO.

Segal Roitman, LLP, of Boston, Massachusetts (James A.W. Shaw on the brief and orally), for Claimants Represented by Communications Workers of America, Local 1400.

Gordon J. MacDonald, attorney general (Laura E.B. Lombardi, senior assistant attorney general, on the brief and orally), for the New Hampshire Department of Employment Security.

LYNN, C.J.  The petitioners, Northern New England Telephone Operations, LLC and FairPoint Logistics, Inc. (hereinafter collectively "FairPoint"), appeal the final decision of the New Hampshire Department of Employment Security (NHES), claiming that it erred in rulings that: (1) upheld the decision of the commissioner of NHES to reopen the ruling of the appeal tribunal which found (a) certain unionized employees of FairPoint (claimants) were not entitled to collect unemployment benefits during the period they were on strike against the company because the strike resulted in a "stoppage of work" and (b) strike pay received by some of the workers constituted income deductible from their benefits; (2) affirmed a subsequent order of a second appeal tribunal which found that benefits were payable because the strike did not result in a stoppage of work; and (3) reversed the second tribunal's determination that strike pay was deductible from benefits.  We reverse the appellate board's decision, reinstate in part the order of the first appeal tribunal, and find it unnecessary to address the issue of strike pay.

I

The record reflects the following pertinent facts.  FairPoint is a regulated telecommunications company that provides voice and broadband internet services to residential, business, and wholesale customers throughout New Hampshire.  The claimants are represented by two unions, the Communications Workers of America (CWA) and the International Brotherhood of Electrical Workers (IBEW).  The collective bargaining agreements between FairPoint and the unions expired in August 2014.  When negotiations failed to produce a new agreement, FairPoint implemented new terms and conditions of employment consistent with the final proposals it had made to the unions.  This resulted in the unions implementing a strike in which approximately 650 New Hampshire union members ceased working.  The strike lasted from October 17, 2014 to February 25, 2015.  During this period, CWA workers who picketed or performed some other task on behalf of that union received strike pay.

The claimants applied for unemployment benefits for the period they were on strike.  Certifying officers of NHES denied their claims on the grounds that their unemployment was due to a labor dispute that resulted in a "stoppage of work."  See RSA 282-A:36 (2010) (stating that "[a] person shall be disqualified for benefits for any week with respect to which the commissioner finds that his or her total or partial unemployment is due to a stoppage of work which exists because of a labor dispute").  The claimants appealed these determinations to the appeal tribunal.  See RSA 282-A:48 (2010).

Following a hearing, the appeal tribunal upheld the decisions of the certifying officers that the claimants were not entitled to benefits because the labor dispute between FairPoint and the unions resulted in a "stoppage of work."  After observing that what constitutes a "stoppage of work" is unsettled in New Hampshire, the tribunal first concluded that there had been a

2

"stoppage of work" within the meaning of RSA 282-A:36 because the claimants had elected to stop working as the result of a labor dispute. Alternatively, the tribunal determined that even if a "stoppage of work" required that there be "a substantial curtailment of the employer's business," the evidence established that this standard was satisfied. The tribunal also found that strike pay received by the CWA union members constituted deductible wages under RSA 282-A:14 (2010). See RSA 282-A:14, III(a) (stating "[a]n individual's maximum weekly benefit amount shall be reduced by all wages and earnings in excess of 30 percent . . . of the individual's weekly benefit amount").

The claimants moved to reopen the case pursuant to RSA 282-A:60 (2010), which states that "[t]he commissioner may . . . reopen the case on the basis of fraud, mistake, or newly discovered evidence." The commissioner granted this request. In so doing, he first found that the appeal tribunal had made a mistake of law in concluding that the term "stoppage of work" meant simply that an employee had voluntarily decided to cease working because of a labor dispute. Acknowledging that construction of this term was not settled law in New Hampshire, the commissioner concluded that the combination of this court's decision in Legacy v. Clarostat Mfg. Co., 99 N.H. 483, 486 (1955), guidance provided by the United States Department of Labor, court decisions from a majority of other states, and a departmental internal guidance directive, constituted persuasive authority that "'stoppage of work' refers to a substantial curtailment of the employer's operations."

The commissioner then concluded that the appeal tribunal's alternative finding that there had been a substantial curtailment of work also was affected by a mistake of law because the tribunal had not articulated a standard by which it reached that determination. However, in so ruling, the commissioner adopted the same standard — substantial curtailment of work — as had been utilized by the appeal tribunal in reaching its decision. Without addressing any of the findings that the tribunal had made in support of its decision or determining whether they were sufficient to satisfy the substantial curtailment standard, the commissioner instead simply listed a number of factors that, on reopening, should be considered by the tribunal in determining whether the standard had been met. Recognizing that case law from other jurisdictions did not provide a definitive listing of factors that must be considered in reaching a decision on the issue, and that such decisions require a "case-by-case, fact-based analysis," the commissioner directed the tribunal to consider "at a minimum, a comparison of [FairPoint's] business revenues, production, services and workers hours before and after the strike," as well as any other industry-specific factors that were relevant.

Finally, with respect to strike pay, the commissioner ruled that because this issue "was intertwined with other issues presented in the Appeal Tribunal proceeding below and was not the subject of extensive testimony," it also should be reopened.

The commissioner ordered that both issues be subject to a de novo rehearing before a new appeal tribunal.[1]  See RSA 282-A:61 (2010).  Following the de novo hearing, the second appeal tribunal ruled that the strike did not result in a "stoppage of work," and therefore that the claimants were entitled to receive unemployment benefits for the period they were on strike.  The second tribunal also found that the strike pay received by some CWA claimants constituted deductible wages within the meaning of RSA 282-A:14.

FairPoint and the claimants both asked the commissioner to reopen the second tribunal's decision.  The commissioner denied these requests.  With respect to FairPoint's request, the commissioner reaffirmed his original decision that the first tribunal had made a mistake of law with respect to the standard for determining whether there had been a substantial curtailment of FairPoint's operations.  He also concluded that there was no basis to reopen the second tribunal's finding that the strike did not result in such a substantial curtailment of operations as to constitute a stoppage of work.  As to the claimants' request, the commissioner found no basis to reopen the second tribunal's finding that the strike pay received by some CWA claimants constituted wages that had to be deducted from their benefits pursuant to RSA 282-A:14.

FairPoint and the claimants both appealed to the appellate board.  See RSA 282-A:64 (2010).  The board: (1) concluded that the commissioner had properly reopened the first tribunal's decision because it was based on a mistake of law as to what constituted a "stoppage of work"; (2) affirmed the second tribunal's decision finding that FairPoint failed to establish that the strike resulted in a "stoppage of work"; and (3) reversed the second tribunal's decision that the strike pay received by certain claimants constituted deductible wages.  The appellate board denied FairPoint's motion for reconsideration, and this appeal followed.

II

Our standard of review is governed by RSA 282-A:67 (2010).  That statute confines our review to the record and prohibits us from substituting our judgment for that of the appeal tribunal, as reversed, modified, or affirmed by the appellate board, as to the weight of the evidence on questions of fact.  RSA 282-A:67, II, IV, V.  We may overturn a decision of the appeal tribunal only if the substantial rights of the appellant have been prejudiced because its findings, inferences, or conclusions are "(a) [i]n violation of constitutional or statutory provisions; (b) [i]n excess of statutory authority; (c) [m]ade upon unlawful procedures; (d) [c]learly erroneous in view of the substantial evidence

---

[1] We note here that both the original appeal tribunal and the second appeal tribunal consisted of a single member (though not the same member), as is permitted by RSA 282-A:53.

4

on the whole record; or (e) [a]ffected by other error of law."  RSA 282-A:67, V[2];
see Appeal of Mullen, 169 N.H. 392, 396 (2016).

III

We first address the stoppage of work issue.  In so doing, for purposes of clarity, at the outset of our analysis, we briefly address an issue that is not in dispute in this case.  In its brief, FairPoint makes no claim that the first appeal tribunal's ruling that a "stoppage of work" means merely that a striking employee voluntarily ceased to perform his duties represents a correct view of the law, and at oral argument its counsel specifically represented that FairPoint does not advance this position.  Consistent with the weight of authority from other jurisdictions, we agree that the first tribunal erred in concluding that the term "stoppage of work" refers to the status of the striking worker's employment and is established merely by the fact that the worker has voluntarily ceased working in order to participate in the strike.  See, e.g., Lourdes Medical v. Board of Review, 963 A.2d 289, 297 & n.4 (N.J. 2007).

Fairport first argues that the commissioner exceeded the authority accorded him by RSA 282-A:60 when he reopened the case on the ground that the first appeal tribunal made a mistake of law.  That statute establishes review by the commissioner as "[t]he second level of appeal" from an adverse ruling of the appeal tribunal.  RSA 282-A:60.  It permits the commissioner, either at the request of an interested party or on his own initiative, to reopen the case.  Id.  However, the grounds upon which the commissioner may reopen are limited to three: fraud, mistake, or newly discovered evidence.  Id.; see Appeal of Mullen, 169 N.H. at 400 ("The commissioner is given the limited authority to reopen 'on the grounds of fraud, mistake, or newly discovered evidence.'" (quoting RSA 282-A:60)).  The commissioner does not have authority to conduct de novo review of an appeal tribunal decision, nor may he reopen a case and direct a new hearing before the same or another tribunal merely because he disagrees with the tribunal's decision.

---

[2] In cases such as Appeal of Kelly, 129 N.H. 462 (1987), we have observed that, under RSA chapter 282-A's statutory scheme, this court's role is limited to reviewing decisions of the appeal tribunal and that we have no authority to review decisions of the appellate board "as such."  Appeal of Kelly, 129 N.H. at 466.  However, given that decisions of the appeal tribunal do not become final so as to permit judicial review until after they have been reviewed by both the commissioner, acting pursuant to RSA 282-A:60, and the appellate board, acting pursuant to RSA 282-A:65, and that in conducting our review of the correctness of the appeal tribunal's decision we must necessarily consider how its decision has been impacted by the actions of the commissioner and the appellate board, we acknowledge that our review pursuant to RSA 282-A:67 effectively encompasses a review of whether the commissioner and the appellate board have properly exercised their statutory authority.  See In re Mullen, 169 N.H. 392 (court reviewed issues concerning whether the commissioner acted properly in reopening decisions of the appeal tribunal).  Insofar as language in our prior cases may be read to suggest that we cannot review the actions of the commissioner or the appellate board in a case that is otherwise properly before us, we now expressly clarify that we do have such authority.

The basis upon which the commissioner reopened the first tribunal's decision in this case was his view that the tribunal made a mistake of law regarding what constitutes a stoppage of work. FairPoint argues that the statutory language permitting reopening for "mistake" allows for reopening only in the case of mistakes of fact, not mistakes of law. In support of its position, FairPoint contrasts the language of RSA 282-A:60, which governs the commissioner's authority to reopen, with that found in RSA 282-A:65 (2010), which confines the appellate board's scope of review to correcting errors of law. FairPoint contends that "[t]he legislature's use of the phrase 'of law' in establishing the Board and this Court's scope of review, and its omission of the phrase 'of law' in establishing the Commissioner's scope of review, require the interpretation that its omission was intentional." We are not persuaded.

The legislature placed no qualification on the types of mistakes that could form the basis for reopening by the commissioner. If, as FairPoint claims, the legislature had intended that only mistakes of fact could be grounds for reopening, it could have included language to that effect in the statute. It did not do so, however, and, under familiar principles of construction, we will not add language to a statute that the legislature did not see fit to include. Appeal of Local Gov't Ctr., 165 N.H. 790, 804 (2014).

We also reject FairPoint's contention that permitting the commissioner to reopen appeal tribunal decisions for errors of law would be inconsistent with the purpose of the statutory scheme. In Appeal of Mullen, we explained that the commissioner's power to reopen under RSA 282-A:60 "streamlines review and enables correction of errors earlier in the process" than would be permitted if this procedure were not available. Appeal of Mullen, 169 N.H. at 404 (quotation omitted). This function is served as much by permitting the commissioner to reopen for mistakes of law as it is by allowing reopening for mistakes of fact. Accordingly, we conclude that RSA 282-A:60 authorizes the commissioner to reopen a decision of the appeal tribunal for mistakes of either fact or law.

However, we disagree with the commissioner and the appellate board that the first appeal tribunal's alternative ruling constituted a mistake of law. The commissioner faulted the first tribunal for failing to articulate a standard for determining what constitutes "substantial curtailment" of the employer's operations. We conclude, after reviewing the record, that when the tribunal stated that it "declines to create such a definition in the absence of guidance from the law, rule, or case law," it was doing so in the context of referring to the first basis for its ruling, i.e., that "the Chairman defines stoppage of work as the claimant's election to stop working because of a labor dispute." That is, what the tribunal was saying was that, because its definition of "stoppage of work" for its first alternative ruling focused on the actions of the claimants and not the effect of those actions on the employer, it could decline to formulate a definition of substantial curtailment because that definition was not relevant to

its first alternative ruling.  See In the Matter of Salesky & Salesky, 157 N.H. 698, 702 (2008) (stating that we interpret a court order as a matter of law).  As already discussed, this ruling was error.  But the tribunal did not end its analysis there.  Instead, the tribunal set forth an alternative basis for its decision, and, for the purpose of that ruling, it adopted the "substantial curtailment" of operations standard.  Applying this standard, the tribunal found that "Fairpoint suffered a substantial curtailment of its business because of the strike."

We conclude that the substantial curtailment of operations standard used by the tribunal in its alternative holding was correct.  Although we have not previously had occasion to consider this issue, doing so now, we agree with the majority view that a substantial curtailment of operations is what is meant by a "stoppage of work." Lourdes Medical Ctr., 963 A.2d at 298-99; see Boguszewski v. Com'r. of Dep't. of Emp., 572 N.E.2d 554, 557-58 (Mass. 1991); Whitcomb v. Dept. of Employment & Training, 520 A.2d 602, 603 (Vt. 1986). We also agree with the prevailing view that whether this standard has been met requires a fact-specific determination based on a consideration of all the facts and circumstances of the particular case.  Boguszewski, 572 N.E.2d at 558; Whitcomb, 520 A.2d at 603.  Because a stoppage of work results in a disqualification from benefits, the burden was on FairPoint to establish that there was a substantial curtailment of its operations.  See Appeal of Moore, 164 N.H. 102, 104 (2012).

The first tribunal determined that FairPoint is a service industry and that, as such, the best criteria to use to determine whether a substantial curtailment of its operations had occurred was to focus on "Fairpoint's ability to provide . . . service and . . . to acquire new customers."  The tribunal found that, as a result of the strike, FairPoint ceased marketing to and servicing new customers for the better part of a year and instead focused all of its efforts on trying to service its existing customers.  It further found that the strike required FairPoint to assign management employees and contract workers to perform tasks that union members would have performed, that because of their unfamiliarity with such work (compared to union employees) the management and contract workers were less productive,[3] and that this "significantly impacted [the company's] ability to stay competitive by meeting its customers' ever increasing demands for faster service and its ability to attract and serve customers in outlying regions."  The tribunal found that the strike resulted in atypical increases in FairPoint's "Troubled Load"[4] and "Order Load,"[5] and also

---

[3] The tribunal credited the testimony of Michael Reed, president of FairPoint operations in the State of Maine, who monitored FairPoint's productivity during the strike.  Reed testified that to achieve the same productivity as its union employees, management and contract workers worked more hours per day than union workers would have worked, but that, because of the reduced number of management and contract workers compared to striking union workers, they worked fewer overall hours than the union workers would have worked.

[4] The "Troubled Load" is the number of pending repair jobs scheduled.

7

an increase in complaints made to the New Hampshire Public Utilities Commission. As an example, the tribunal observed that in October 2014, after the strike began, FairPoint's Troubled Load doubled from what it had been in the middle of September 2014. The tribunal also rejected the claimants' argument that the disruption of FairPoint's business resulted from bad weather that occurred in or around the time of the strike, observing that making weather-related repairs is a normal part of FairPoint's business and that the strike negatively impacted its ability to perform "an essential function of its business."

Based on the above findings, the tribunal summarized its alternative ruling as follows: "Had the Chairman elected to define work stoppage as a substantial curtailment of Fairpoint's business, Fairpoint has met the burden of proof, by a preponderance of the evidence, to show that [it] suffered a substantial curtailment of [its] business because of the striking workers."

Because the first tribunal adopted the correct definition of "stoppage of work" as a "substantial curtailment of Fairpoint's business" and considered the proper factors in determining that a "stoppage of work" had occurred, we conclude that it made no error (or mistake) of law and that the commissioner therefore erred in reopening the tribunal's decision. See RSA 282-A:67, V(e).

To the extent the commissioner's reopening decision can be read to suggest that the "mistake of law" supporting reopening was the absence of sufficient evidence to demonstrate a substantial curtailment of operations, we reject that conclusion as well. The commissioner faulted the tribunal for failing to follow NHES Directive 340-17, which purportedly "establishes procedures for Local Office Managers to follow if any employer makes them aware of a labor dispute occurring in the area." However, not only is there no indication in this directive that it is intended to guide the deliberations of appeal tribunals, but, more importantly, the directive references many issues that have little or nothing to do with whether there was a stoppage of work.[6] And insofar as the directive does outline the factors to be considered in determining if there was a stoppage of work, the first appeal tribunal considered such factors, notwithstanding that it did not specifically cite the directive as a basis for so doing. Paragraph 7 of attachment A to the directive states that the following factors should be considered with respect to the issue of whether there was a stoppage of work: (a) production stopped or severely curtailed; (b) shipments stopped; (c) operation shutdown; (d) dollar amounts/percentage of curtailment; and (e) deliveries of materials. The directive does not indicate that all of these

[5] The "Order Load" is the number of pending jobs for installation of service for new customers.
[6] For example, attachment A to the directive indicates that information should be obtained regarding who gave notice of the decision to commence renegotiations after the expiration of an earlier collective bargaining agreement, what meetings were held, what were the employer's offers and the union's demands with regard to benefits, wages, holidays, pensions, and working conditions, and how far apart labor and management were as to the forgoing items.

factors have to be present in every case to establish that a stoppage of work has occurred, and it is apparent that, depending on the type of industry at issue, some factors may be inapplicable (e.g., delivery of materials would likely have no applicability to a service business).

Here the tribunal found that, as a result of the strike, FairPoint essentially ceased its work in attempting to attract and service new customers in order to concentrate on providing service to existing customers. The tribunal also found that, even with its operations so limited, the company fell significantly behind in keeping up with repair work both because it was not able to replace with management and contract workers all the hours that would have been worked by the union workers and because the replacement workers were not as productive as the striking workers. Although there was undoubtedly conflicting evidence, and conflicting inferences that could be drawn from the evidence, it was the tribunal's responsibility to resolve such conflicts and to find the facts, and the record contains sufficient evidence to support the tribunal finding that there was a substantial curtailment of FairPoint's operations.[7]

Indeed, the only factor cited in the commissioner's reopening letter that the tribunal did not specifically discuss was a comparison of FairPoint's business revenues before and after the strike. However, while such a comparison of business revenues would have been relevant to the tribunal's decision, and its absence could have caused the tribunal to be unpersuaded, as a factual matter, that a stoppage of work occurred, the failure of the company to produce such evidence could not have resulted in a mistake of law because the "curtailment of . . . revenues" is not "a necessary element for invoking the labor dispute disqualification" from unemployment benefits. Boguszewski, 572 N.E.2d at 558; see Lourdes, 963 A.2d at 293 ("[L]oss of revenue attributable to the strike, which does not result in a substantial curtailment of work at the hospital, is not the equivalent of a 'stoppage of work'"); Whitcomb, 520 A.2d at 604 (upholding finding of substantial curtailment of work where, though telephone service to customers was not significantly affected, and billings and payments to employees and vendors were not curtailed at all, certain of the employer's activities, such as statistical

---

[7] We emphasize here that the determination of whether there was a substantial curtailment of operations was a question of fact to be decided by the appeal tribunal. Here, the evidence was sufficient to support the first tribunal's finding that there was a substantial curtailment of FairPoint's operations. Thus, the fact that there may also have been sufficient evidence to support a contrary finding, such as the one made by the second tribunal, that there was not a substantial curtailment of operations, is irrelevant to our analysis. The important point is that, because the first tribunal committed no error of law, and its decision was supported by the evidence, there was no lawful basis for there to be a proceeding before the second tribunal. Cf. Okongwu v. Stephens, 488 N.E.2d 765, 767-68 & n.6 (Mass. 1986) (stating that while an order granting a motion for a new trial is not immediately appealable, a party aggrieved by the verdict on retrial may then appeal and obtain review of the order granting the new trial).

reports, settlement studies, call card investigation work, and toll fraud investigations were completely halted, and construction, equipment installation, and facilities testing were largely suspended); Monsanto Chem. Co. v. Comm'r of Labor, 314 S.W.2d 493, 496 (Ark. 1958) (considering number of oil barrels produced, not revenue, in determining whether stoppage of work continued to exist).

Similar to the situation in General Electric Co. v. Director of Division of Employment Security, 208 N.E.2d 234 (Mass. 1965), here, as the tribunal found, the effect of the strike was to cause FairPoint to all but shut down one part of its operation — marketing to and servicing of new customers. If this consequence in itself were not sufficient to establish a substantial curtailment of operations, see General Elec. Co., 208 N.E.2d at 238, it, combined with the other disruptions of FairPoint's operations as described above, certainly sufficed to show a substantial disruption.

In sum, we conclude that the commissioner erred in his determination that the first tribunal's decision resulted from a mistake of law. Contrary to the commissioner's view that the tribunal based its decision merely on what he described (but did not define) as a "negative impact" analysis, [8] we conclude that the tribunal had sufficient evidence before it from which it could — and did — find that the strike resulted in a substantial curtailment of FairPoint's operations and thus constituted a stoppage of work under RSA 282-A:36. For the same reason, we also conclude that the appellate board erred as a matter of law insofar as it ultimately upheld the commissioner's decision to reopen and did not affirm the decision of the first tribunal with respect to the stoppage of work issue. See RSA 282-A:65, III (explaining that the appellate board may reverse decision of the appellate tribunal if affected by reversible errors of law).

Because the stoppage of work disqualifies the claimants from receiving unemployment benefits during the period when they were on strike, we find it unnecessary to address the issue of whether the strike pay received by some of the claimants constituted deductible wages.

Appellate board's decision reversed; decision of first appeal tribunal reinstated in part.

HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred.

---

[8] We note that the commissioner first referred to his view that the first tribunal had utilized a "negative impact" analysis in his ruling declining to reopen the second tribunal's decision. Since this ruling is part of the record before us and provides further illumination of the reasoning which led the commissioner to erroneously reopen the ruling of the first tribunal, it may properly be considered in our analysis.